**LOCAL UNION NO. 12, UNITED RUBBER, CORK, LINOLEUM & PLASTIC WORKERS OF AMERICA, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 22239.

United States Court of Appeals
Fifth Circuit.

Nov. 9, 1966.

**14**

Clarence Rhea, Gadsden, Ala., Robert L. Carter, New York City, for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Melvin J. Welles, Atty., N. L. R. B., Washington, D. C., for respondent.

Before RIVES and THORNBERRY, Circuit Judges, and GARZA, District Judge.

THORNBERRY, Circuit Judge.

Petitioner, United Rubber, Cork, Linoleum & Plastic Workers of America, AFL–CIO, Local Union No. 12 (hereinafter referred to as Local 12), initiated these proceedings to review a determination by the National Labor Relations Board that Local 12 had engaged in unfair labor practices within the purview of sections 8(b) (1) (A), 8(b) (2), and 8(b) (3) of the Labor Management Relations Act, 61 Stat. 136 (1947), as amended, 29 U.S.C. § 141 et seq., by refusing to process certain grievances of eight Negro employees in its bargaining unit at Goodyear Tire & Rubber Company of East Gadsden, Alabama. The facts underlying the controversy are virtually undisputed.

Local 12 has been the exclusive collective bargaining representative of Goodyear's East Gadsden plant employees since 1943. Until March 1962, three separate seniority rolls—white male, Negro male, and female—were maintained, although the bargaining contract between Goodyear and Local 12 appeared to provide for plantwide seniority without regard to race or sex. As a matter of custom and interpretation during this period, Negro employees with greater seniority had no rights over white employees with less seniority, and vice versa, with respect to promotions, transfers, layoffs, and recalls. Also as a matter of custom, racially separate plant facilities such as lunchrooms, restrooms and showers were maintained, although no provision in the bargaining contract dealt with such matters.

The eight complainants were laid off in August or September 1960, and were recalled approximately one year later. In October 1961, Buckner, one of the eight complainants, having been notified that he was to be again laid off, inquired why a white employee with less seniority continued to remain employed. He was informed by the assistant manager of

Goodyear's labor department that the posted job was a "white job." Thereupon, Buckner and the other complainants, who were also in layoff status, executed affidavits that during their period of layoff subsequent to August or September 1960, new workers had been hired in violation of plant seniority rules. These affidavits were forwarded to the President of Local 12, requesting that Local 12 investigate the alleged grievances and take remedial action. The complainants appeared before the grievance committee on December 8, 1961, and presented a more complete "Statement of Complaint" which charged (1) that the original layoff and recall had not been in accordance with contract-stated seniority and that complainants demanded reinstatement with back wages, (2) that upon recall complainants wanted all transfer privileges as set forth in the contract, and (3) that complainants demanded the right to all plant privileges without color barriers. The committee concluded that "no contract violation exists, therefore, the Union has no ground on which to base a complaint against the company." Subsequent appeals to the union executive board and the full union membership were likewise denied. In March 1962, complainants appealed the action of Local 12 to George Burdon, the union's International President. In light of the information requested by Burdon, and provided by the complainants and Local 12, he concluded that the decision refusing to process the grievances should be reversed.

While Local 12 continued to refrain from filing a formal grievance, the record reflects that in the latter part of March 1962 union representatives met with company officials and a representative of the President's Committee on Equal Employment Opportunity[1] to discuss the racially segregated employment practices. These discussions apparently culminated in a verbal agreement between Local 12 and Goodyear to discontinue any application of the bargaining contract which confined Negro and white employees to particular jobs and restricted opportunities for upgrading, recall, and transfer to jobs theretofore separated on racial lines. Complainants were reinstated and there is no evidence that any racially discriminatory practices with regard to job opportunities, transfer, promotion, layoff, or participation in Goodyear's training program existed after March 1962. It is further clear from the record, however, that Local 12 continued to refuse to process the grievances concerning back wages for the period of layoff occasioned by application of the seniority system in effect prior to March 1962, as well as those concerning the continued segregated nature of plant facilities.[2] Accordingly, on October 22, 1962, the initial unfair labor practice charges were filed against Local 12.

In reversing the trial examiner's determination that no unfair labor practice had been established, the Board concluded that petitioner, by refusing to process the grievances concerning back wages and segregated plant facilities, had thereby (1) restrained or coerced complainants in their section 7 right to be represented without invidious discrimination, (2) caused or attempted to cause Goodyear to discriminate against complainants, and (3) refused to bargain in complainants' behalf, thus violating sections 8(b) (1) (A), 8(b) (2), and 8(b) (3) of the act.[3] Petitioner was according-

1. Established by Exec. Order No. 10925, March 6, 1961, 3 CFR (Supp.1961, at 86).

2. As late as July 13 and July 16, 1962, Local 12 President Bowers continued to refuse to take action upon these claims. Joint Appendix, pp. 42, 96. Such conduct clearly fell within the six-month period preceding the filing of the initial un-

fair labor practice charge and petitioner's claim that the charges were untimely within contemplation of section 10(b) of the act is therefore unfounded.

3. Section 8(b) (1) (A) provides that
It shall be an unfair labor practice for a labor organization or its agents (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in

ly ordered to process the grievances through arbitration and to propose to Goodyear specific contractual provisions prohibiting racial discrimination in terms and conditions of employment pursuant to the oral agreement of March 1962. From that order Local 12 petitions this Court for review.

The facts of this controversy once again present the critical challenge of striking a meaningful balance, consistent with existing labor policy, between individual employee rights and the continued effectiveness of the collective bargaining process. Essential to an adequate analysis of any issue involving the scope of union responsibility to those it represents is the recognition that administration of internal union affairs constitutes a significant element in the collective bargaining process. Accordingly, the vital issue in this area resolves itself into that of determining at what point the exclusive bargaining agent's duty to represent fairly the interests of each individual employee must bow to the equally comprehensive obligation of negotiating and administering the bargaining contract in accordance with the act's primary policy of fostering union-employer relations. While the Supreme Court has declared that an exclusive bargaining agent "is responsible to, and owes complete loyalty to, the interests of all whom it represents," Ford Motor Co. v. Huffman, 1953, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048, 1058, it

has at the same time recognized the inherent burden this mandate serves to impose upon a union obliged to exercise good faith in adjusting the numerous competing interests of its individual members:

> Inevitably differences will arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.

Ibid. Nevertheless, when the individual employee, pursuant to federal law aimed at preserving industrial harmony, is required to surrender completely his right of self-representation in deference to an "exclusive" bargaining agent designated by a majority of his coworkers, both logic and equity dictate that such agent be impressed with a reciprocal duty to "represent all its members, the majority as well as the minority, and * * * to act for and not against those whom it represents." Steele v. Louisville & N.R. R., 1944, 323 U.S. 192, 202, 65 S.Ct. 226, 232, 89 L.Ed. 173, 183; see Hughes Tool

---

section 7 * * *. 61 Stat. 141 (1947), as amended, 29 U.S.C. § 158(b).
Section 7 provides that
    Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities * * *. 61 Stat. 140 (1947), 29 U.S.C. § 157.
Section 8(b) (2) provides that
    It shall be an unfair labor practice for a labor organization or its agents * * * (2) to cause or attempt to cause an employer to discriminate against an employee

in violation of subsection (a) (3) * * *. 61 Stat. 141 (1947), as amended, 29 U.S.C. § 158(b).
Section 8(a) (3) provides that
    It shall be an unfair labor practice for an employer * * * (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *. 49 Stat. 452 (1935), as amended, 29 U.S.C. § 158(a).
Section 8(b) (3) provides that
    It shall be an unfair labor practice for a labor organization or its agents * * * (3) to refuse to bargain collectively with an employer * * *. 61 Stat. 141, 29 U.S.C. § 158(b).

Co. v. NLRB, 5th Cir. 1945, 147 F.2d 69, 74, 158 A.L.R. 1165. Indeed, the Supreme Court has indicated that any statute purporting to bestow upon a union the exclusive right to represent all employees would be unconstitutional if it failed to impose upon the union this reciprocal duty of fair representation. Steele v. Louisville & N.R.R., supra, 323 U.S. at 198–199, 65 S.Ct. at 230, 89 L.Ed. at 180–181.

Although the concept of "fair representation" is generally thought of as having arisen initially in Steele v. Louisville & N.R.R., which involved a controversy under the Railway Labor Act, 44 Stat. 577 (1926), 45 U.S.C. § 151 et seq., the Supreme Court on that same day declared an indentical duty to be implicit in section 9(a) of the National Labor Relations Act.[4] Wallace Corp. v. NLRB, 1944, 323 U.S. 248, 65 S.Ct. 238, 89 L.Ed. 216. Subsequent decisions, moreover, have further confirmed the principle that this duty of fair representation constitutes a fundamental limitation upon union activity under the act. E. g., Humphrey v. Moore, 1965, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370; Syres v. Oil Workers Int'l. Union, 1955, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 285, reversing 5th Cir. 1955, 223 F.2d 739; Ford Motor Co. v. Huffman, supra. Therefore, we are not here called upon to establish such duty but rather to face the issue of what conduct represents a breach of that duty, together with its appropriate remedy. More specifically, we must determine whether a breach of the duty of fair representation in itself constitutes an unfair labor practice within contemplation of the National Labor Relations Act, as amended. We are convinced that the duty of fair representation implicit in the exclusive-representation requirement in section 9(a) of the act comprises an indispensable element of the right of employees "to bargain collectively through representatives of their own choosing" as guaranteed in section 7. We therefore conclude that by summarily refusing to process the complainants' grievances concerning back wages and segregated plant facilities, petitioner thereby violated section 8(b) (1) (A) of the act by restraining those employees in the exercise of their section 7 rights.

At the outset it must be reiterated that every union decision which may in some way result in overriding the wishes or disappointing the expectations of an individual employee, or even an appreciable number of employees, does not in and of itself constitute a breach of the fiduciary duty of fair representation. Even in the administration stage of the bargaining contract, when the necessity of adjusting competing employee claims may not be as pressing as during the negotiation stage where rigorous scrutiny of each compromise might frustrate the act's policy of encouraging industrial peace, the union must necessarily retain a broad degree of discretion in processing individual grievances.[5] Thus, where the union, after a good faith investigation of the merits of a grievance, concludes that the claim is insubstantial and refuses to encumber further its grievance channels by continuing to process the unmeritorious claim, its duty of fair representation may well be satisfied.[6] Such good-faith effort to repre-

---

4. Section 9(a) provides that

Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment. * * * 49 Stat. 453 (1935), as amended, 29 U.S.C. § 159(a).

5. See Elgin, J. & E. Ry. v. Burley, 1945, 325 U.S. 711, 739–741, 65 S.Ct. 1282, 1297–1298, 89 L.Ed. 1886, 1903–1904, where the Supreme Court indicated that a union's discretion in compromising individual claims in the administration stage of the bargaining contract may not be as broad as in the negotiation stage.

6. It is reasonable to assume that the General Counsel of the Board, pursuant to the discretion invested in him under section 3(d) of the act, will refuse to

sent fairly the interests of individual employees, however, is not evidenced in this controversy. To the contrary, Local 12 in open disregard of the recommendations of its International President has continued to refuse to represent the vital interests of a segment of its membership. The claims with regard to back pay and segregation of plant facilities clearly concern meritorious issues involving wages and conditions of employment, issues with respect to which these employees have relinquished to the union as exclusive bargaining agent their individual rights to negotiate. See J. I. Case Co. v. NLRB, 1944, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762. Neither does the mere fact that the act provides that an individual employee may present his claim directly to the employer [7] diminish the union's duty of fair representation, for admittedly the grievance of a single employee can have little force in the absence of support from his bargaining representative.[8] Conley v. Gibson, 1957, 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed. 2d 80, 84. Undoubtedly, the duty of fair representation can be breached by discriminatory inaction in refusing to process a grievance as well as by active conduct on the part of the union. Conley v. Gibson, supra; Steele v. Louisville & N. R. R., supra, 323 U.S. at 204, 65 S.Ct. at 226, 89 L.Ed. at 184; Hughes Tool Co. v. NLRB, supra note 8. The Supreme Court has declared that

> The bargaining representative's duty * * * does not come to an abrupt end * * * with the making of an agreement between union and employer. Collective bargaining is a continuous process. Among other things, it involves day-to-day adjustments in the contract and other working rules, resolution of new problems not covered by existing agreements, and the protection of employee rights already secured by contract. The bargaining representative can no more unfairly discriminate in carrying out these functions than it can in negotiating a collective agreement.

Conley v. Gibson, supra, 355 U.S. at 45, 78 S.Ct. at 102, 2 L.Ed.2d at 84.

■ In defense of its refusal to process the claims for back wages arising during the period when seniority was applied on a racial basis, the union argues that since those practices have been abandoned, recognition of the back wage claims for that period would in effect

---

issue a complaint against a union when an employee claim is clearly without merit. Indeed, at least four unfair representation claims were dismissed as being baseless during the period between Miranda Fuel Co., 1962, 140 N.L.R.B. 181, and Independent Metal Workers Union, 1964, 147 N.L.R.B. 1573, the first two cases in which the Board held a breach of the duty of fair representation to be an unfair labor practice. Armored Car Chauffers Union, 145 N.L.R.B. 225; New York Typographical Union, 1963, 144 N.L.R.B. 1555; Millwrights Union, 1963, 144 N.L.R.B. 798; Houston Chronicle Publishing Co., 1963, 140 N.L.R.B. 1267.

7. Section 9(a) contains the proviso that
   [A]ny individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract * * * [and] the bargaining repre-

sentative has been given opportunity to be present at such adjustment. 49 Stat. 453 (1935), 29 U.S.C. § 159(a).

8. While the Supreme Court has ruled that the employee must attempt to pursue the grievance procedure set forth in the bargaining contract before seeking other remedies, Republic Steel Corp. v. Maddox, 1965, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580, substantial doubt exists concerning the extent of the employee's "right" to compel his employer to comply with the grievance and arbitration provisions in the bargaining contract when his union refuses to represent him. See Black-Clawson Co. v. International Ass'n of Machinists, 2d Cir. 1962, 313 F. 2d 179; Ostrofsky v. United Steelworkers, D.Md.1959, 171 F.Supp. 782, aff'd, 4th Cir. 1960, 273 F.2d 614, cert. denied, 1960, 363 U.S. 849, 80 S.Ct. 1628, 4 L.Ed.2d 1732. But see Hughes Tool Co. v. NLRB, 5th Cir. 1945, 147 F.2d 69, 158 A.L.R. 1165; Donnelly v. United Fruit Co., 1963, 40 N.J. 61, 190 A.2d 825.

render its decision to abandon the practices retroactive. It thus contends that its choice to reject the claims in order to avoid such effect was not based upon considerations of an arbitrary or unfair nature. Significantly, however, from 1943 to March 1962 the union consistently adhered to the practice of applying seniority on a racial basis, conduct which manifested a patent breach of its duty of fair representation. As the Supreme Court in *Steele* observed:

> [T]he statutory power to represent a craft and to make contracts as to wages, hours, and working conditions does not include the authority to make among members of the craft discriminations not based on such relevant differences. * * * [D]iscriminations based on race alone are obviously irrelevant and invidious.

323 U.S. at 203, 65 S.Ct. at 232, 89 L.Ed. at 183; Conley v. Gibson, supra; see Brotherhood of Ry. Trainmen v. Howard, 1952, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283; Tunstall v. Brotherhood of Locomotive Firemen, 1944, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187; Syres v. Oil Workers Int'l. Union, 5th Cir. 1955, 223 F.2d 739, 745 (Rives, J., dissenting), rev'd per curiam, 1955, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785. As the Board properly concluded, had the claims been allowed to proceed to arbitration, an arbitrator would not have been bound by the prior invalid interpretation of the contract and might well have awarded back wages. We thus conclude that where the record demonstrates that a grievance would have been processed to arbitration but for arbitrary and discriminatory reasons, the refusal to so process it constitutes a violation of the union's duty to represent its members "without hostile discrimination, fairly, impartially, and in good faith." Steele v.

Louisville & N. R. R., supra, 323 U.S. at 204, 65 S.Ct. at 233, 89 L.Ed. at 184.

Similarly, with respect to the grievances concerning the segregated nature of plant facilities, the union not only refused to process such claims but actively opposed desegregation of shower and toilet facilities.[9] It is impossible for us to look upon such conduct as anything other than an effort to discriminate against Negro employees with respect to conditions of employment. As exclusive representative of all employees in the bargaining unit, Local 12's statutory obligation required it "to make an honest effort to serve the interests of all of those members, without hostility to any." Ford Motor Co. v. Huffman, supra, 345 U.S. at 337, 73 S.Ct. at 686, 97 L.Ed. at 1057. In summarily refusing to consider in good faith the merits of these grievances, the union's conduct inarguably failed to meet this standard. As the Board properly concluded, "whatever may be the bases on which a statutory representative may properly decline to process grievances, the bases must bear a reasonable relation to the Union's role as bargaining representative or its functioning as a labor organization; manifestly racial discrimination bears no such relationship." 150 N.L.R.B. at 312, 317.

We have been able to find but one appellate decision on the specific issue of whether a breach of the union's duty of fair representation constitutes an unfair labor practice. NLRB v. Miranda Fuel Co., 2d Cir. 1963, 326 F.2d 172. That decision, moreover, was comprised of three separate opinions.[10] Careful study of those opinions and the briefs in this case, in conjunction with the thorough and well-reasoned commentaries in this area,[11] convinces us

---

9. See letter from Local 12 President Bowers to International President Burdon, July 13, 1962. Joint Appendix, p. 153.

10. Judge Medina wrote the majority opinion; Chief Judge Lumbard wrote a concurring opinion, and Judge Friendly dissented.

11. E. g., Aaron, Some Aspects of the Union's Duty of Fair Representation, 22 Ohio St.L.J. 39 (1961); Albert, NLRB–FEPC, 16 Vand.L.Rev. 547 (1963); Blumrosen, The Worker and Three Phases of Unionism, 61 Mich.L.Rev.

that Local 12, in refusing to represent the complainants in a fair and impartial manner, thereby violated section 8(b) (1) (A) by restraining them in the exercise of their section 7 right to bargain collectively through their chosen representatives. The mere fact that Local 12's conduct may not have directly resulted in encouraging or discouraging union membership does not persuade us to alter our determination, for the language of section 8(b) (1) (A), unlike certain other provisions of section 8,[12] is not restricted to discrimination which encourages or discourages union membership.

It is upon this point that we must respectfully decline to concur in the reasoning of Judge Medina in NLRB v. Miranda Fuel Co., supra, that since section 8(b) (3) was intended as merely a counterpart of the employer's duty to bargain collectively under section 8(a) (5), and since section 8(b) (2) requires a showing of discrimination by the employer under section 8(a) (3) which serves to encourage or discourage union membership, Congress must have intended that the application of section 8(b) (1) (A) should also be limited to conduct affecting union membership.[13] This argument that section 8(b) (1) (A) should thus be restricted because section 7 rights are limited by these other enforcement provisions of section 8 is, as has been pointed out by one commentator in this area, to allow "the remedial tail to wag the substantive dog." Blumrosen, supra note 11, at 1510. As exclusive bargaining representative, Local 12 had the duty to represent fairly *all* employees, union members and non-members alike. To adopt a narrow interpretation of section 8(b) (1) (A) which would only protect the comprehensive section 7 right of employees to bargain collectively in those cases involving union conduct which encourages or discourages union membership would to a large degree render such right meaningless in the area of union administration of the bargaining agreement.[14] Indeed, it is only through the day-to-day administration of

1435 (1963); Cox, The Duty of Fair Representation, 2 Vill.L.Rev. 151 (1957); Hanslowe, The Collective Agreement and the Duty of Fair Representation, 1963 Lab.L.J. 1052; Herring, The "Fair Representation" Doctrine, 24 Md.L.Rev. 113 (1964); Murphy, The Duty of Fair Representation Under Taft-Hartley, 30 Mo.L. Rev. 373 (1965); Sherman, Union's Duty of Fair Representation and the Civil Rights Act of 1964, 49 Minn.L.Rev. 771 (1964); Sovern, The National Labor Relations Act and Racial Discrimination, 62 Colum.L.Rev. 563 (1962); Sovern, Race Discrimination and the National Labor Relations Act: The Brave New World of Miranda, N.Y.U. 16th Annual Conference on Labor 3 (1963); Summers, Individual Rights in Collective Agreements and Arbitration, 37 N.Y.U.L.Rev. 362 (1962); Weiss, Federal Remedies for Racial Discrimination by Labor Unions, 50 Geo.L.J. 457 (1962); Wellington, Union Democracy and Fair Representation, 67 Yale L.J. 1327 (1958); Comment, Discrimination and the NLRB, 32 U.Chi.L. Rev. 124 (1964); Comment, Racial Discrimination and the Duty of Fair Representation, 65 Colum.L.Rev. 273 (1965); Note, Administrative Enforcement of the Right to Fair Representation, 112 U. Pa.L.Rev. 711 (1964); Comment, Refusal

To Process a Grievance, the NLRB, and the Duty of Fair Representation, 26 U. Pitt.L.Rev. 593 (1965); Note, Federal Protection of Individual Rights Under Labor Contracts, 73 Yale L.J. 1215 (1964).

12. See sections 8(b) (2) and 8(a) (3), supra note 3.

13. Chief Judge Lumbard, resting his concurrence in *Miranda* on the ground that no breach of the union's duty of fair representation had been established, found "no cause for the court even to consider the important and far-reaching question * * * whether action which violates a union's duty of fair representation may constitute an unfair labor practice in violation of section 8(b) (1)." 326 F.2d at 180. Judge Friendly based his dissenting opinion upon the finding of an unfair labor practice under section 8(b) (2) and thus did not reach the section 8(b) (1) (A) issue. Ibid.

14. Section 8(b) (1) (A) has been construed broadly to encompass a broad range of conduct. E. g., International Ladies Garment Workers Union A.F.L.-C.I.O. v. NLRB, 1961, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762; Communications Workers, etc. v. NLRB, 1960, 362 U.S. 479, 80 S.Ct. 838, 4

individual grievances that employee rights achieved in the negotiated bargaining contract are placed in a definitive context, and through which specific individual claims find a vital means of protection.

Moreover, the Board's recent assertions that fair representation constitutes an essential element of section 7 employee rights [15] are even more convincing in light of the similarity in language between section 7 and section 2 of the Railway Labor Act,[16] from which the Supreme Court in *Steele* perceived congressional intent to impose such duty of fair representation upon the bargaining representative. In that case, the Court reasoned that since the jurisdiction of the Railway Adjustment Board did not encompass disputes between employees and unions, the remedy must necessarily be sought in the courts. Since the National Labor Relations Board has, however, been given jurisdiction over employee-union disputes, the Court's

logic in *Steele*, reinforced by the Board's express desire to assume jurisdiction, further supports our conclusion that unfair representation cases are properly subject to Board jurisdiction. Significantly, the violation of every other duty imposed by the act, including the general duty to bargain collectively, has been designated an unfair labor practice, and we find no compelling reason to conclude that a breach of the duty of fair representation was intended to represent a single, narrow exception to Board jurisdiction.[17]

Recognition of a breach of the union's duty of fair representation as an unfair labor practice will have the necessary effect of bringing such controversies within the primary jurisdiction of the Board, thus requiring some degree of reorientation of current jurisdictional practices. In San Diego Bldg. Trades Council v. Gorman, 1959, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775, the Supreme Court established the sweep-

L.Ed.2d 896; Radio Officers, etc. v. NLRB, 1954, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455; NLRB v. United Packinghouse Workers, 5th Cir. 1957, 274 F.2d 816; NLRB v. International Woodworkers of America, 5th Cir. 1957, 243 F.2d 745; see Local 100 of the United Ass'n of Journeymen, etc. v. Borden, 1963, 373 U.S. 690, 83 S.Ct. 1423, 10 L.Ed.2d 638.

15. Local 1376, International Longshoremens Union, 1964, 148 N.L.R.B. 897; Automobile Workers Union, 1964, 149 N.L.R.B. 482; Independent Metal Workers Union, 1964, 147 N.L.R.B. 1573; Miranda Fuel Co., 1962, 140 N.L.R.B. 181, enforcement denied, 2d Cir. 1963, 326 F.2d 172.

16. Section 2, Fourth of the Railway Labor Act provides

Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter. 48 Stat. 1187 (1934), 45 U.S.C. § 152, Fourth.

17. Petitioner relies heavily upon Syres v. Oil Workers Int'l. Union, 1955, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785, reversing

5th Cir. 1955, 223 F.2d 739, where the Supreme Court in a per curiam opinion reversed a decision by this Court which had concluded that the federal courts were without jurisdiction to enjoin enforcement of a collective bargaining contract which allegedly violated the union's duty of fair representation. Petitioner argues that had the discriminatory conduct complained of in that case been viewed as an unfair labor practice, the Supreme Court would have accordingly ruled that primary jurisdiction lay in the Board. Significantly, however, that case clearly involved a breach of the bargaining contract which the Court has subsequently ruled to be within the jurisdiction of the courts, notwithstanding that an unfair labor practice may also be involved. Smith v. Evening News Ass'n, 1963, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246. Moreover, recent Supreme Court decisions have expressly left open the issue whether a breach of the duty of fair representation constitutes an unfair labor practice. Republic Steel Corp. v. Maddox, 1965, 379 U.S. 650, 652, 85 S.Ct. 614, 616, 13 L.Ed.2d 580, 582; Humphrey v. Moore, 1964, 375 U.S. 335, 344, 84 S.Ct. 363, 369, 11 L.Ed.2d 370, 378; Local 100, United Ass'n of Journeymen, etc. v. Borden, 1963, 373 U.S. 690, 696 n. 7, 83 S.Ct. 1423, 1427 n. 7, 10 L.Ed.2d 638, 642 n. 7.

ing doctrine that "[w]hen an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board." A notable exception to this doctrine of preemption is provided in section 301(a) of the act,[18] however, which brings suits for violation of the bargaining contract within the jurisdiction of the courts. Thus, if the claim of an aggrieved employee is based essentially on breach of contract, even though it might also arguably involve a violation of section 7 or 8, it is established that the courts may entertain the controversy. Humphrey v. Moore, supra; Smith v. Evening News Ass'n, supra note 17. Accordingly, with respect to violations of this hybrid nature, the employee is at liberty to invoke the primary jurisdiction of the Board to assert the unfair labor practice claim or to proceed in the courts on a contract theory. Recognizing a breach of the duty of fair representation as an unfair labor practice should not affect this alternative. Indeed, the Supreme Court in Humphrey v. Moore, supra, has clearly indicated that "[e]ven if * * * [a breach of the duty of fair representa-

tion] is, or arguably may be, an unfair labor practice," if a violation of the bargaining contract is also involved, the state and federal courts will also have jurisdiction over the controversy. Id. 375 U.S. at 344, 84 S.Ct. at 369, 11 L.Ed. 2d at 378.

The critical area requiring jurisdictional readjustment will involve those controversies, such as the instant case, where the aggrieved employee's claim is not founded on a breach of the bargaining contract, but rather is based squarely upon an alleged violation of the union's duty of fair representation.[19] In this situation, the unfair labor practice jurisdiction of the Board will apparently be exclusive, totally preempting that of the courts.[20] San Diego Bldg. Trades Council v. Gorman, supra. We are convinced that this result is desirable for at least two reasons.

First, it will serve to resolve the current jurisdictional uncertainties confronting an individual employee seeking redress for a failure of his union to represent him in good faith. In Local 100, United Ass'n of Journeymen, etc. v. Borden, supra note 17, the Supreme Court recently ruled that even though an employee claim is couched in terms

18. Section 301(a) provides that

Suits for violation of contracts between an employer and a labor organization * * * may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties. 61 Stat. 156 (1947), 29 U.S.C. § 185(a).

19. In addition, numerous cases are likely to arise where employees asserting unfair representation claims which also involve an alleged breach of contract choose to invoke the jurisdiction of the Board rather than that of the courts.

20. Although Syres v. Oil Workers Int'l. Union, supra, clearly involved a violation of the bargaining contract in addition to a breach of the duty of fair representation, that decision might be interpreted as establishing the principle that the courts should retain jurisdiction over unfair representation cases even where no breach of the bargaining contract is in-

volved. Syres arose, however, prior to the Supreme Court's comprehensive extension of the preemption doctrine in Gorman, and well before the Board began to express its intention to assert jurisdiction over unfair representation cases. Thus, at the time of Syres, the employee's sole remedy for a breach of the duty of fair representation lay in the courts.

The Board has at times indicated that under certain circumstances it will rescind the certification of a union shown to have violated its duty of fair representation. See, e. g., Pioneer Bus Co., 1962, 140 N.L.R.B. 54; A. O. Smith Corp., 1957, 119 N.L.R.B. 621; Pittsburg Plate Glass Co., 1955, 111 N.L.R.B. 1210; Hughes Tool Co., 1953, 104 N.L.R.B. 318. Such drastic remedy, however, is of little practical benefit to an aggrieved individual employee and would appear clearly inappropriate in numerous controversies, such as the instant case, involving arbitrary union conduct with respect to a small minority of employees.

of breach of contract, if the claim is based essentially on union interference with "employment relations" it must be first presented to the Board since it may arguably involve an unfair labor practice.[21] Accord, Local No. 207, International Ass'n of Bridge, etc., Workers v. Perko, 1963, 373 U.S. 701, 83 S.Ct. 1429, 10 L.Ed.2d 646. This extension of the preemption doctrine appears equally applicable to employee claims based essentially on a breach of the duty of fair representation to the extent that these claims often involve union interference with "employment relations." In such situations the aggrieved employee must initially assert his claim before the Board with the bleak prospect of beginning anew in the courts if the Board concludes that the only violation involved in his claim is a breach of the union's duty of fair representation. Recognizing a violation of the duty of fair representation as an unfair labor practice will avoid this jurisdictional predicament of "sending the impecunious plaintiff back to the courts when the Board finds the union's action to have been wholly arbitrary." NLRB v. Miranda Fuel Co., supra, 326 F.2d at 181 (Friendly, J., dissenting).

Secondly, the adequacy of existing judicial remedies afforded individual unfair representation claims has been seriously questioned. Under current practice, the aggrieved employee is not only compelled to bear the substantial expense of an individual lawsuit, but must also face the burden of overcoming the strong judicial presumption of legality of union action in this area.[22] Thus confronted with jurisdictional, monetary, and procedural obstacles, the individual employee may well find his right to fair representation as enforced by the courts more theoretical than real.

■ In light of these considerations, we are convinced that the rights of individual employees to be fairly represented can be more fully achieved within the spirit of the act by recognizing the Board as the appropriate body to meet the challenge of uniformly administering standards of fair representation. Its peculiar expertise with respect to the complexities of the bargaining process, its broad powers of investigation, and most importantly, its power to encourage informal settlements at the regional director level render it better qualified than the necessarily diverse system of state and federal tribunals to meet the task of formulating and applying uniform standards of fair representation in such manner as to afford adequate protection to employee rights without unduly impeding the collective bargaining process.[23] We have confidence in the

---

21. In *Borden*, the plaintiff, after five years of litigation in the courts, was instructed to initiate an unfair labor practice proceeding before the Board with the prospect of returning to the courts if the Board concluded that the only violation involved in his claim was that of the union's duty of fair representation. See also Humphrey v. Moore, supra, 375 U.S. at 351, 84 S.Ct. at 373, 11 L.Ed.2d at 382 (Goldberg, J., separate opinion), 375 U.S. at 359, 84 S.Ct. at 377, 11 L.Ed. 2d at 387 (Harlan, J., dissenting).

22. It has been pointed out that the courts in these cases improperly indulge in a heavy presumption of regularity of union action similar to the presumption of constitutionality applicable in the area of judicial review of state economic action. Wellington, supra note 11, 67 Yale L.J.

at 1339-43; see Murphy, supra note 11, 30 Mo.L.Rev. at 375-77. Similarly, the failure of the courts to appreciate the necessity for a more limited range of permissible union discretion in the administration stage of the bargaining contract as opposed to the negotiation stage has been criticized as an undue restriction of individual employee rights. Blumrosen, supra note 11, 61 Mich.L.Rev. at 1469-72. See also, Herring, supra note 11, 24 Md.L.Rev. at 146-48.

23. It has also been advanced that recognition of primary Board jurisdiction in this area may well have the commendable effect of encouraging increased arbitration of unfair representation claims, thus avoiding just such disputes as that involved in this case. Blumrosen, supra note 11, 61 Mich.L.Rev. at 1514-16.

competence of the Board to discharge this delicate task of striking a meaningful balance between its primary duty of promoting union-management relations and that of safeguarding the section 7 rights of employees, a task which will entail nothing new to the agency initially designated as the appropriate body to construe and apply the unfair labor practice provisions of the act as well as its representation provisions.

In thus concluding that a breach of the duty of fair representation constitutes an unfair labor practice, we are not unmindful that Title VII of the Civil Rights Act of 1964, effective July 2, 1965, makes it an "unlawful employment practice" for a union to discriminate against "any individual because of his race, color, religion, sex, or national origin" or to cause or attempt to cause an employer to do so. Section 703(c) (1)–(3), 78 Stat. 255 (1964), 42 U.S.C. § 2000e–2(c) (1)–(3). Since the claims before us arose fully three years prior to the effective date of Title VII, its pertinent provisions are clearly inapplicable in this controversy. Nevertheless, it is equally clear that had these claims arisen after July 2, 1965, the complainants under our holding today would be at liberty to seek redress under the enforcement provisions of Title VII or to assert unfair labor practice charges before the Board.[24] This problem of overlapping remedies, however, would exist even in the absence of recognition of a breach of the duty of fair representation as an unfair labor practice, for undeniably unfair labor practice charges arising under many provisions of section 8 will also involve union and employer conduct proscribed by Title VII.[25] We recognize that while Title VII represents an appreciable addition to the protection afforded employee rights in the specific areas of discrimination covered by the Civil Rights Act, there continues to exist a broad potential range of arbitrary union conduct not specifically covered by Title VII which may also violate the union's duty of fair representation.[26] The comprehensive right of an employee to be represented fairly and in good faith by his exclusive bargaining agent clearly encompasses more than freedom from union discrimination based solely upon race, religion, and sex. The mere fact, therefore, that Congress has seen fit to provide specific protection to employees from union and employer discrimination in the area of civil rights in no way detracts from the legal and practical bases of our determination that a breach of the union's duty of fair representation constitutes a violation of section 8(b) (1) (A).

Having thus concluded that petitioner's breach of the duty of fair representation constitutes an unfair labor practice under section 8(b) (1) (A) of the act, we need not consider the Board's additional contentions that such conduct also violated sections 8(b) (2) and 8(b) (3). We also conclude that under the circumstances the Board did not exceed the scope of its remedial powers in ordering petitioner to process the grievances in question through arbitration and to propose to the employer contractual provi-

24. Legislative history and specific provisions of the act itself make it apparent that Congress did not intend to establish the enforcement provisions of Title VII as the exclusive remedy in this area. See sections 708, 1103, 78 Stat. 262, 268 (1964), 42 U.S.C. §§ 2000e–7, 2000h–3. See also 110 Cong.Rec. 13171 (daily ed. June 12, 1964) where the Senate rejected a proposed amendment which would have had the effect of rendering the remedial provisions of Title VII exclusive with regard to all claims arising under it.

25. We need not pass upon the issue of whether the Board should refrain from asserting jurisdiction over those claims of discrimination covered by Title VII which might also involve an unfair labor practice. See Sherman, supra note 11, 49 Minn.L.Rev. at 804.

26. See, e. g., Humphrey v. Moore, supra; NLRB v. Miranda Fuel Co., supra; Union News Co. v. Hildreth, 6th Cir. 1961, 295 F.2d 658, aff'd on rehearing, 1963, 315 F.2d 548; cf. Ferro v. Railway Express Agency, Inc., 2d Cir. 1961, 296 F.2d 847.

sions aimed at prohibiting continued racial discrimination in terms and conditions of employment as expressed in the oral agreement of March 1962.

Enforcement granted.