**Howard O. TEDFORD, Plaintiff,**

v.

**PEABODY COAL COMPANY and International Union, United Mine Workers of America, et al., Defendants.**

**Civ. A. No. 73-G-602-S.**

United States District Court,
N. D. Alabama, S. D.

July 24, 1974.

Charles H. Huey, John W. Cooper, Cooper & Huey, Birmingham, Ala., for plaintiff.

Jack Drake, Drake, Knowles & Still, University, Ala., for UMWA; Joseph Yablonski & Daniel Edelman, Washington, D. C., counsel for UMWA.

J. Gusty Yearout, Lange, Simpson, Robinson & Somerville, Birmingham, Ala., for Peabody Coal Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GUIN, District Judge.

This action is brought against defendants, United Mine Workers International Union (hereinafter referred to as UMWA) and Peabody Coal Company, for the alleged violation of Section 301 of the National Labor Relations Act (NLRB), 29 U.S.C. 185(a).[1] Federal jurisdiction is alleged under the same statute.

Plaintiff seeks relief in the form of $10,000.00 in compensatory damages, $50,000.00 in punitive damages, an award of shovel operator's job, and an award of reasonable attorney's fees.

## FACTS

Peabody Coal Company owns and operates the Warrior Mine located at Warrior, Alabama. Plaintiff is an employee of Peabody Coal and a member of Local 1500 of the United Mine Workers of America. District 20 is an administrative division of the UMWA and is responsible for the state of Alabama.

The National Bituminous Coal Wage Agreement of 1968 (applicable from October 1, 1970, until November 11, 1971) and the National Bituminous Coal Wage Agreement of 1971 (applicable from November 12, 1971, and presently in effect) are the written results of collective bargaining between the UMWA and Peabody. Article XIII, Section (e) of the 1971 agreement and Section 5 of the seniority clause of the 1968 agreement are identical in wording and they state:

> Employees will be granted leave of absence in order to serve as a district or international officer or representative and shall retain their seniority earned prior to their layoff and will continue to accrue seniority while serving in the capacity of union officer or representative.

Pursuant to these sections, plaintiff requested and was granted by Peabody leaves of absences that ran from October 1, 1970, until February 12, 1973. The time period consisted of four back-to-back leaves of one year, three months, one year, and three months, for a total of two and one-half years continuous.

1. Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

During this time plaintiff served as a full-time representative of District 20.

On February 12, plaintiff terminated his leave of absence and returned to work at the Warrior Mine.

During his absence, his former job had been posted as open and bid upon as a permanent position. Norman Starnes was the successful bidder and he worked plaintiff's former job of shovel operator. When plaintiff returned Starnes continued to occupy the same position, with the result that both plaintiff and Starnes were on a job which required only one person. This situation continued until February 1973, when plaintiff was removed from the job of shovel operator and assigned the less-skilled and lower-paid job of pumper. The shovel operator's job at the time of plaintiff's assignment to it paid $46.00 for seven and one-quarter (7¼) hours work, while the pumper's job at said date paid $39.00 for seven and one-quarter (7¼) hours work.

There developed a dispute prior to February 8, 1973, as to the union's position concerning the right of an employee to return to his exact same job following termination of his leave of absence. On February 8, 1973, Mr. Harry Patrick, the secretary-treasurer of UMWA, issued a memorandum to all UMWA district presidents and secretary-treasurers. The memorandum interpreted Article XIII, Section (e) of the National Bituminous Coal Wage Agreement of 1971, and noted in part:

> Our interpretation of this is that a worker will be entitled to return to the place he would have held on the seniority roster had he not taken leave of absence. That is to say, he returns with full seniority. He is to be given a job to which his seniority and qualifications entitle him. This may or may not be his own job, depending upon consequences.

On February 21, 1973, plaintiff filed two grievances for what he considered an improper denial of his old job. At steps one and two of the grievance procedure, Local 1500 represented plaintiff and supported plaintiff's position. At step three, the UMWA represented plaintiff, and it was at that time resolved that plaintiff would not return to his old job.

Since February 19, 1973, higher paying jobs were posted for bidding, but plaintiff, although qualified, did not bid on any of these positions.

From October 1, 1970, until December 21, 1972, W. A. Boyle was president of the UMWA. Boyle was succeeded as international president by Arnold Miller, who presently holds that office.

The evidence shows that during the Boyle administration the interpretation of the leave-of-absence provision was that a man was entitled to return to his old job upon the expiration of his temporary leave of absence. Over the years this had been President Boyle's interpretation of the contract and this position was conveyed to C. E. Beane, the president of District 20; indeed, on four comparable occasions at the Warrior Mine, men had left to work for the union and when they returned received their old jobs. The constitution of the international union at all material times placed the power of interpretation of doubtful language in labor-management contracts (on the part of the union) in the international president *alone*.

Boyle himself instructed plaintiff to take only a leave of a year at a time in order to keep the leaves classified as temporary. Defendant Peabody admitted that its posting of the job as a permanent opening was error on its part. The testimony also shows that two Peabody officials represented to plaintiff that he would be entitled to return to his old job.

It was Peabody's position in its answer to interrogatories that its interpretation of the language of the labor-management agreement would be whatever interpretation the union insisted upon. Beane, at a conference with union officials on February 1, 1973, vigorously as-

serted the interpretation consistently asserted by Boyle for many years.

Plaintiff was not removed from the position of shovel operator until after Beane received a phone call from President Miller on February 19, 1973. In this conversation Miller informed Beane of the interpretation expressed in the February 8th Patrick memorandum. Beane then relayed the UMWA's official position to Peabody, and plaintiff was subsequently removed from the shovel operator's job to the position of pumper. Beane at all material times was occupying a position which was appointive (by the international president) and was removable by the international president. All actions after February 1, 1973, by Beane were therefore in effect the actions of Miller.

## JURISDICTION

Subject matter jurisdiction under Section 301 of the Taft-Hartley Act, also recognized as the National Labor Relations Act, 29 U.S.C. 185(a), is challenged on four separate grounds.

■ The first assertion on behalf of defendants is that there is not a "violation of a contract between an employer and a labor organization representing employees."

The court rejects this argument because it finds, with explanations postponed for later discussion, that a contract was involved, and that terms of the contract were indeed violated.

■ Defendants' next contention is that plaintiff did not exhaust internal remedies provided for the settling of grievances. Plaintiff does not challenge the basic rule of law that administrative remedies must be exhausted before judicial aid is sought. Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965). Plaintiff contends, rather, that he has exhausted all his internal remedies.

■ When the untried remedies in a grievance procedure are not within the power of the complaining employee, but are rather within the sole power of the union, the remedies, therefore, as to the individual employee, have in fact been exhausted. Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

■ Local 1500 supported plaintiff's position at steps one and two of the grievance procedure, but the UMWA represented plaintiff at step three. There the UMWA abandoned plaintiff's position on the basis of the Miller administration's interpretation of the provision of the Bituminous Coal Wage Agreement in question. There was no recourse remaining to plaintiff other than to seek the aid of the court.

Concerning defendants' allegation that Local 1500 could have elected to pursue plaintiff's complaint to the International Executive Board, plaintiff himself was unable to demand such appeal, and the evidence shows no movement by the local toward this appeal. Defendants failed to carry their burden of proof in establishing that plaintiff sought judicial aid while the matter was still viable and being pursued administratively through the grievance procedure. Forline v. Helpers Local 42, 211 F.Supp. 315 (E.D.Pa.1962).

Defendants next contend that if the allegation can be classified as an "unfair labor practice" that the matter is within the exclusive jurisdiction of the National Labor Relations Board. 29 U.S.C. § 158(b) and § 160.

While this issue may have been in doubt in the past, Local 12, United Rubber Workers v. N.L.R.B., 368 F.2d 12 (5th Cir. 1966), it has been thoroughly laid to rest in an extensive discussion in *Vaca*. The court stated (speaking of § 301 breach of duty cases), that

We cannot assume from the NLRB's tardy assumption of jurisdiction in these cases that Congress, when it enacted NLRA, Section A(b) in 1947, intended to oust the courts of their traditional jurisdiction to curb arbitrary conduct by the individual employee's statutory representative.

■ *Vaca* ends its thorough discussion with the proposition that merely be-

cause a fair representation suit may be determined an unfair labor practice as well does not mean that the federal courts do not have jurisdiction of a Section 301 fair representation suit.

The last issue raised by defendants against jurisdiction is simply that, since plaintiff alleged that the Miller administration's leave of absence policy was in retaliation to Boyle supporters, any remedy was within the exclusive jurisdiction of the Secretary of Labor, pursuant to the Landrum-Griffin Act. Defendants cite no authority in support of such a position.

The right of the Secretary of Labor to press a claim under the Landrum-Griffin Act, 29 U.S.C., Subchapter II, § 411 et seq., is not inconsistent with a private right of action. Forline v. Marble Workers Local 42, 211 F.Supp. 315 (E.D.Pa.1962). Also, under the rational of the *Vaca* decision, this suit is properly in the federal court. As already stated, a charge of violation of the duty to fairly represent is clearly within this court's jurisdiction.

Jurisdiction is well founded.

Neither is the claim for relief bad because of Alabama's one-year statute of limitations for tort actions, which state statute has been held applicable in suits involving a union's breach of its statutory duty of fair representation. De Arroyo v. Sindicato de Trabajadores Packinghouse, AFL-CIO, 425 F.2d 281 (1st Cir. 1970). The statute does not run until the damage accrues. Sanderson v. Ford Motor Co., 483 F.2d 102 (5th Cir. 1973). Such time in the instant case was when plaintiff was removed from the shovel operator's position.

## CONCLUSIONS OF LAW

### I.

The collective bargaining agreement in Article XIII, Section (e) of the 1971 National Bituminous Coal Wage Agreement, makes no mention of the right of an employee on temporary leave on union business to return to his same job.

Plaintiff, however, contends that returning to the exact same job was a matter of past practice, custom, and policy, and, by virtue of Article XIX, Section (b) of the Collective Bargaining Agreement, this past practice, custom, and policy has been incorporated into the National Bituminous Coal Wage Agreement of 1971. Section (b) reads as follows:

> This agreement supersedes all existing and previous contracts except as incorporated and carried forward herein by reference; and all local agreements, rules, regulations, and customs heretofore established in conflict with this agreement are hereby abolished. Prior practice and custom not in conflict with the agreement may be continued.

It is true, as plaintiff contends, that "contract" within the meaning of Section 301 is to be given a broad interpretation. The courts have rejected a narrow and technical interpretation in favor of a liberal interpretation in order to give effective remedies in those cases where the union bargains with the employer on behalf of employees. Deaton Truck Line, Inc. v. Teamsters Local 612, 314 F.2d 418 (5th Cir. 1962); Sanderson v. Ford Motor Co., 483 F.2d 102 (5th Cir. 1973).

It is not, however, necessary in deciding this suit to determine all that might come within the definition of "contract" within the meaning of Section 301, since custom was expressly mentioned in the bargaining agreement. The issue, then, is factual and is whether a past policy, practice or custom did indeed exist.

The evidence shows that on four comparable instances employees of Peabody took leaves of absence and returned to their own jobs. These comparable instances were not exactly the same in detail with plaintiff's situation. They involved shorter leaves and the employees' return caused a mere shift roll-back rather than forcing employees to change their job classifications. There is enough similarity, however, to support

the basic proposition that it was usual in the Warrior Mine for an employee returning from temporary work with the union to receive his old job. The court finds from this fact, coupled with the explicit representations made to plaintiff by the union and by Peabody concerning plaintiff's old job prior to his taking any leave of absence, that past policy, practice or custom did indeed exist, as contended by plaintiff.

The evidence shows, also, other grounds winning to plaintiff's position on this issue of contract provisions, even without a finding of custom. Tony Boyle's interpretation of the ambiguous "leave of absence" section was an interpretation made on behalf of the union. It became the union's position. Peabody concurred in this interpretation when Peabody stated that its position during the time in question was that a man would be entitled to his old job upon the UMWA's demand. It is fundamental contract law that the proper meaning of an ambiguous section of the contract is the interpretation given it by the parties to the contract. Stagg v. Connecticut Mut. L. Ins. Co., 10 Wall. (U.S.) 589, 19 L.Ed. 1038 (1870).

The same interpretation by both parties relieves Section (e) of its ambiguity. That a man returning from a leave of absence pursuant to Section (e) is entitled to his own job is as much a part of Section (e) as if those words were expressly contained in that section. Plaintiff's right, therefore, to return to his old job existed without the necessity of finding past practice, policy or custom.

## II.

By prevailing on the issue of contract interpretation, however, plaintiff has not won his case. The fact that the terms of agreement reached between the union and the company were altered does not per se give a claim for relief under Section 301. The company and the union may reverse their positions in regard to the interpretation of contract provisions or in regard to a union member's position in a grievance procedure. Harris v. Chemical Leaman Tank Lines, 437 F.2d 167 (5th Cir. 1971).

The limitations upon this right to change positions were well explained in Steele v. Louisville & Nashville Railroad Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). That case involved collective bargaining pursuant to the Railway Labor Act, 45 U.S.C. § 151 et seq. It was held that when a statute allows a union to act as the exclusive bargaining agent for all employees the union has the inherent duty to fairly represent.

The bargaining unit must fairly represent all empoyees since, under the act, employees do not have the right to bargain individually on their own behalf. The court in Steele likened the representative position of the union with the relationship between the Congress of the United States and the citizens it represents, and imposed upon the union as exacting a duty to represent fairly all interests on whose behalf it bargains. The same statutory requirement of fair representation by a union underlies the National Labor Relations Act. Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953); Wallace Corp. v. N. L. R. B., 323 U.S. 248, 65 S.Ct. 238, 89 L.Ed. 216 (1944).

A Section 301 violation by a union, then, does not occur unless there is a breach of the duty to represent fairly.

Every union decision which may in some way result in overriding the wishes or disappointing the expectations of an individual employee, or even an appreciable number of employees, does not in and of itself constitute a breach of the fiduciary duty of fair representation. Local 12, United Rubber Workers v. N. L. R. B., 368 F.2d 12, 17 (5th Cir. 1966).

Contrary to Peabody's incorrect reading of Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), which is the main case authority in this

area, the answer in determining breach of this duty is not in finding discrimination for "hostile and invidious reason." *Vaca*, at page 190, 87 S.Ct. at page 916, says this about what constitutes a breach of the duty to represent fairly:

> A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining union is arbitrary, discriminatory, or in bad faith.

■ The question before the court is whether the conduct in question falls within this test. The question is resolved by the following considerations of fact.

Plaintiff consented to take the temporary employment position with the union with the understanding that he would return to his old job. He based his belief upon representations made by company officials and by the union. Pursuant to instructions from Tony Boyle, plaintiff kept his leaves of absence restricted to no more than a year at the time, for the express purpose of keeping his job classified as temporary, so that he would be able to return to his old job. Plaintiff had a right to rely on these promises, and he had a right to rely on Boyle's interpretation of the "leave of absence" section. The court expressly finds that plaintiff's leaves were "temporary" and not "permanent."

The court notes that the Boyle interpretation was a reasonable interpretation for the following reasons.

Section (e) also provided that the employee on leave of absence to work for the union would not only retain his seniority but would continue to accrue seniority while serving in the capacity of union officer or representative. Such words imply that the essence of the section was that the employee was to be treated as if he were still on the job. It would not seem reasonable that a man would leave his job for a stay with the union that was classified as temporary without assurance that he would be restored to his old position. Plaintiff was the most senior employee at the mine when he took his first temporary leave and at all times since.

In light of these findings of justified reliance, a reversal of interpretation or custom which is to have a retroactive effect amounts in itself to arbitrary conduct.

There were allegations that plaintiff was singled out for this retroactive treatment because of plaintiff's support in Tony Boyle's reelection bid, but the evidence was insufficient to prove such assertions. The finding that the actions complained of were arbitrary is, however, enough to give relief under Section 301.

### III.

■ A Section 301 suit may give recourse against both employer and union. Smith v. Evening News Association, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962).

> A union's breach of its duty of fair representation may open the way not only to a suit against itself, but also against the employer. When both the employer and the union are sued, the issue of the union's breach of its duty of fair representation may be equally important for both defendants. Sanderson v. Ford Motor Co., 483 F.2d 102, 110 (5th Cir. 1973).

The finding that the union breached its statutory duty of fair representation is decisive of the issue of the employer's liability in the instant case. The employer admitted that its position in this matter was to passively acquiesce in whatever decision the union made, which it did.

It is Peabody's position, however, that it is not liable with the union for any damages which may be awarded, or, in the alternative, that it be allowed to recover against the union for any damages which it might have to pay. The court does not accept this argument in light of the facts of the present case.

■ Where the union has breached its duty of fair representation, and the employer has breached its contract, and both parties are liable in damages for their respective wrongs, it is the duty of the court to fashion appropriate remedies in regard to union and employer. These appropriate remedies are obtained by apportioning the amount of damages to the extent that each party was responsible for their incursion. Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L. Ed.2d 842 (1967).

■ The union is certainly responsible for the entire amount of the damages sustained by plaintiff. The court also feels that Peabody is equally responsible for the whole amount of damages incurred by plaintiff. Both parties were involved at the initiation of the wrong done plaintiff. Both parties were involved in the decision to deny plaintiff the job to which he was entitled—the union through its active part in the decision, and the employer for its wrongful passivity.

Peabody cannot be excused from liability merely because its violation of contract came from lack of interest as to the outcome of the dispute. Peabody may not be thus excused from its contract obligations.

■ For the purpose of reducing damages, defendants point out that plaintiff did not bid on higher paying jobs to which his seniority entitled him. It is a fundamental principle of contract law that one is under a duty to mitigate damages. 25 C.J.S. Damages § 33 (1966).

In Schneider v. Electro Auto-Lite Company, 456 F.2d 366 (6th Cir. 1972), that same principle was reiterated in a Section 301 suit. The court there was concerned with a class action brought by employees who were improperly denied their contract right to be offered jobs in another plant upon the closing of the plant in which they had been working. In speaking to this § 301 action, the court said that the employees were, of course, under a duty to mitigate their damages.

■ This duty to mitigate extends to plaintiff in the instant case. He was obligated to bid upon the higher paying positions, even though none of them was plaintiff's old job of shovel operator. This he was obligated to do in order to minimize compensatory damages.

■ Plaintiff seeks an award of punitive damages as well as compensatory damages. The court is of the opinion that this case lacks the facts necessary to justify consideration of such an award. There has not been proven the bad motive or willfulness that is associated with this type of damages.

■ The court is inclined, however, to allow reasonable attorneys' fees to plaintiff, such fees being a proper item of compensatory damage in a Section 301 suit.

We think the award of attorneys' fees to the successful party in a suit brought under Section 301 of the Labor Relations Management Act constitutes an appropriate item of damage to be awarded in courts in the enforcement of the national labor policy. United Steel Workers of America, AFL–CIO v. Butler Manufacturing Company, 439 F.2d 1110, 1113 (8th Cir. 1971).

The court concludes, therefore, that plaintiff is entitled to reinstatement to his former position of shovel operator, that he is to be allowed reasonable attorneys' fees, that he is denied any punitive damages, and that he is entitled to damages suffered from the decrease in wages as a result of his being denied his former job. The computation of lost wages is to be submitted to the court within thirty (30) days by plaintiff, after conferring with defendants (to be reduced by the amount of monetary damage plaintiff could have avoided by bidding on those positions which he could have obtained because of his superior seniority), together with a proposed final order.