Charla J. KRAHEL, Plaintiff,

v.

OWENS-BROCKWAY GLASS CONTAINER, INC., a Delaware corporation, and a division of Owens–Illinois, Inc.; Owens–Illinois, Inc., a Delaware corporation; Local 3112 Glass Molders Pottery Plastics & Allied Workers Union; Glass Molders Pottery Plastics & Allied Workers International Union, Defendants.

Civil No. 96–1280–AS.

United States District Court,
D. Oregon.

March 13, 1997.

Judy Danelle Snyder, Cynthia Halse Stutsman, Hoevet & Snyder PC, Portland, OR, for Charla J. Krahel.

Christine Kitchel, Stoel Rives, Portland, OR, Lee Ann Huntington, Stephen M. Hankins, Morgenstein & Jubelirer, San Francisco, CA, for Owens-Brockway Glass Container Inc., Owens Illinois Inc.

Gene B. Mechanic, Goldberg Mechanic & Stuart, Portland, OR, Carl S. Yaller, Glass Molders Pottery Plastics & Allied Workers Int'l Union, Media, PA, for Local # 12 Glass Molders, Pottery, Plastics & Allied Workers Union, Glass, Pottery, Plastics & Allied Workers Int'l Union.

## OPINION

ASHMANSKAS, United States Magistrate Judge:

Plaintiff Charla Krahel brings this action against defendants Owens–Brockway Glass Container, Inc., and its parent Owens–Illinois, Inc. (collectively "Owens"), and against Local 112 of the Glass Molders Pottery Plastics & Allied Workers Union ("Local 112") and its parent Glass Molders Pottery Plastics & Allied Workers International Union (collectively "Union").

Owens has moved to dismiss (or in the alternative to stay) the action on grounds the Collective Bargaining Agreement ("CBA") between Owens and the Union contains a mandatory grievance and arbitration procedure. Owens has also moved to dismiss all claims against the parent Owens–Illinois for failure to state a claim, to strike the claims for damages in excess of the cap established by the 1991 Civil Rights Act and to dismiss the sixth claim for negligence. Plaintiff has conceded the motion to dismiss the negligence claim, so I will not address it further.

## BACKGROUND

I acknowledge that the parties have very different versions of the facts in this case and the inferences to be drawn from those facts. For purposes of these motions, however, the factual allegations of the complaint are generally presumed to be true and plaintiff is entitled to the benefit of all reasonable inferences from those facts.[1] Plaintiff is an employee of defendant Owens–Brockway Glass. Plaintiff is also a member of defendant Local 112, which represents certain employees of Owens. There is a collective bargaining agreement ("CBA") between the Union and Owens. Plaintiff was employed by Owens for over five years as a carton assembler and bulk pack operator. In September 1989, plaintiff applied for an apprentice electrician position with Owens. There were 36 applicants for the position. Plaintiff was the only female applicant. Plaintiff scored higher than all other applicants on the qualifying test, but she was not selected for the apprentice electrician position. Instead, the position was offered to Phil Huddleston. Mr. Huddleston is now Vice–President of Local 112, though it is unclear from the pleadings whether he also held that position in September 1989. The selection committee was composed of three members of Local 112 and three members of the Owens' management team. Plaintiff was designated as the runner-up. When Huddleston was unable to accept the position for personal reasons, plaintiff was awarded the apprenticeship by default.

Plaintiff was scheduled to take her state electrician's examination in November 1993. In October 1993, Local 112 agent Dan Benson and Owens' plant manager Mark Recker sought to dissuade plaintiff from taking the examination as scheduled. They told plaintiff they didn't believe she was ready to take

---

1. There are limited exceptions for jurisdictional allegations and similar matters, where the court may consider some materials outside the complaint and may resolve certain factual disputes to the extent they are separable from the merits of the controversy. *Winter v. California Medical Review, Inc.*, 900 F.2d 1322, 1324 (9th Cir.1990); *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir.1987.)

the exam and advised her to extend her apprenticeship for another six months. Plaintiff discussed the matter with a representative of the state licensing agency, who advised her that the apprenticeship could not be extended without approval by the agency and that plaintiff would be dropped from the apprenticeship program unless she sat for the November examination. Plaintiff took and passed the November 1993 examination.

After passing the examination, plaintiff applied for a day shift position. Plant manager Recker told plaintiff's supervisor that plaintiff "will never see straight days." Male employees with lesser seniority were assigned to the day shift, but plaintiff was not permitted to work the day shift during Recker's tenure as plant manager. Recker was reassigned to a different Owens facility in April 1995, after which plaintiff was allowed to work the day shift.

For more than six years—beginning around the time she was awarded the apprenticeship position and continuing through the date the complaint was filed—plaintiff was ostracized by the male employees, most or all of whom were members of Local 112. They refused to sit near her in the breakroom and joked about that behavior. Plaintiff repeatedly was told that the male employees did not like her and did not want to work with her. A nude centerfold of a woman was posted in Owens' shop area with plaintiff's name written across the breast. An obscene drawing of a woman was found in the men's restroom at Owens with plaintiff's name written by the picture. Plaintiff was told that she was a "birth defect" and referred to as that "fucking cunt."

The male journeymen who supervised plaintiff deliberately placed her in the dirtiest jobs and joked about making sure plaintiff got dirty. She was told, "You won't last a month", "You won't want to get dirty", and "You'll be afraid of breaking your nails." Some of the male employees, including an agent of Local 112, told plaintiff that she was incompetent and that all she did was sit in the office on her ass. A journeyman mechanic, who is a member of Local 112, told plaintiff "There ain't no damn female who is ever going to be [my] equal."

According to the complaint, the discriminatory treatment did not subside with the passage of time, but instead persisted. In April 1996, a drawing was posted in plaintiff's work area depicting plaintiff and her sister, whom she had been training, with the caption "the dumb training the stupid." Derogatory comments about plaintiff were written on machines where she works. Plaintiff believes that some of her equipment was sabotaged to make it appear that she was not competently performing her job.

In March 1996, Swede Lindholm, President of Local 112, stated that plaintiff did not know what her license entailed. Around the same time, another Local 112 agent commented that plaintiff was unable to perform her job duties without one of the men "holding [plaintiff's] hand." A Local 112 agent told a new employee whom plaintiff was assigned to train that "it must be a real put-down to be trained by a woman." Plaintiff's welding skills were criticized and it was proposed that she be required to become a certified welder. No similar requirement has been imposed upon any male electrician at this Owens facility.

On numerous occasions between 1990 and 1996 plaintiff complained to her supervisors and crew leaders about the manner in which she was being treated, but was told that there was nothing Owens could do about the situation.[2] In March 1996, when plaintiff complained about being called a "fucking cunt," plaintiff's supervisor took her complaint to Local 112's president, Swede Lindholm, and vice-president, Phil Huddleston. Their response was to criticize plaintiff's job performance.

In April 1996, plaintiff filed a complaint against Owens with the Oregon Bureau of Labor and Industries ("BOLI") and the EEOC, alleging sexual harassment and unlawful employment practices. In May 1996, plaintiff passed the Owens' management pro-

---

**2.** There is some suggestion that plaintiff did not personally witness certain incidents, and her supervisors told plaintiff they could not rely upon hearsay. However, that is not entirely clear in the complaint.

file test and applied for a management position for which she was qualified. The position was given to a male employee from outside Owens' Portland facility. In June 1996, plaintiff and five male employees at Owens' Portland facility were selected for a journeyman training program. The following week, there was an unsuccessful attempt to mediate plaintiff's claims against Owens. The EEOC and BOLI both issued "right to sue" letters. One week later, plaintiff was informed by Owens that she could not participate in the training program. Plaintiff subsequently filed additional complaints against Local 112 and Owens with BOLI and the EEOC, and received "right to sue" letters.

Plaintiff has asserted claims against Owens and the Union for violation of Title VII and ORS 659.030(1)(b). These claims appear to be premised on a hostile work environment theory. Plaintiff also has asserted state and federal law claims against Owens for unlawful retaliation (after she filed her Title VII claim with BOLI and EEOC). Finally, plaintiff has asserted claims against all defendants for "negligence" in failing to train its personnel concerning compliance with laws and regulations prohibiting sexual harassment and gender-based discrimination.[3]

### Mandatory Arbitration and Grievance Procedure

The Owens defendants have moved to dismiss plaintiff's claims on grounds the collective bargaining agreement between Owens and the Union establishes a mandatory grievance procedure, which culminates in binding arbitration, for resolving all disputes. Owens cites the following language in Article 32 of the CBA:

Section 1. The Company and the Union will comply with all laws preventing discrimination against any employee because of race, color, religion, sex, national origin, age, handicap, or veteran status.

Section 2. This Contract will be administered in accordance with the applicable provisions of the Americans with Disabilities Act. Before taking action relevant to this Section, the Company will meet with the Local Union, and both parties will have sufficient opportunity to express their opinions regarding an anticipated action.

Section 3. Any disputes under this Article as with all other Articles of this Contract shall be subject to the grievance procedure.[4]

## I

Whether an employer and labor union may agree between themselves to arbitrate or otherwise limit an employee's civil rights claims has long been the subject of controversy. In *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), an employee was discharged, allegedly on account of his race. The collective bargaining agreement expressly provided "that there shall be no discrimination against any employee on account of race, color, religion, sex, national origin, or ancestry," and further provided that "[n]o employee will be discharged, suspended or given a written warning notice except for just cause." As in the instant case, the CBA in *Alexander* established a mandatory four-step grievance procedure culminating in binding arbitration.

The plaintiff in *Alexander* asserted a grievance, went to arbitration with the company, and lost. He then filed suit against the employer. The district court dismissed on grounds the action was barred by the binding arbitration clause in the CBA. The Supreme Court disagreed. Title VII was designed to supplement rather than supplant, existing laws and institutions relating to employment discrimination. An individual

---

**3.** Plaintiff has conceded the motion to dismiss the negligence claim against Owens. The Union did not move to dismiss, so the negligence claim against the Union remains in this case.

**4.** The CBA does not expressly say that all Title VII claims are subject to binding arbitration to the exclusion of judicial remedies. It merely says that "disputes under this Article ... shall be subject to the grievance procedure." Article 26 is entitled "Grievance Procedure". The arbitration clause is in Article 27. However, arbitration clauses in collective bargaining agreements tend to be broadly construed. *See Mitchell v. Hercules, Inc.*, 410 F.Supp. 560 (S.D.Ga.1976). My resolution of other issues in this case makes it unnecessary to decide this question.

does not forfeit his private cause of action if he first pursues his grievance to final arbitration under the nondiscrimination clause of a collective-bargaining agreement. *Id.* at 48–49, 94 S.Ct. at 1019–20. In a unanimous decision, the Court also rejected the suggestion that the employee's right to bring a Title VII action had been waived by the arbitration clause in the CBA:

> To begin, we think it clear that there can be no prospective waiver of an employee's rights under Title VII. It is true, of course, that a union may waive certain statutory rights related to collective activity, such as the right to strike. These rights are conferred on employees collectively to foster the processes of bargaining and properly may be exercised or relinquished by the union as collective-bargaining agent to obtain economic benefits for union members. Title VII, on the other hand, stands on plainly different ground; it concerns not majoritarian processes, but an individual's right to equal employment opportunities. Title VII's strictures are absolute and represent a congressional command that each employee be free from discriminatory practices. Of necessity, the rights conferred can form no part of the collective-bargaining process since waiver of these rights would defeat the paramount congressional purpose behind Title VII. In these circumstances, an employee's rights under Title VII are not susceptible of prospective waiver.

*Id.* at 51–52, 94 S.Ct. at 1021 (internal citations omitted.). The Court observed that an employee may waive his rights as part of a settlement agreement. However, in determining the effectiveness of any such waiver a court would have to determine that the employee's consent to the settlement was voluntary and knowing. In no event can the submission to arbitration of a claim under the nondiscrimination clause of a collective-bargaining agreement constitute a binding waiver with respect to an employee's rights under Title VII. *Id.* at 52 n. 15, 94 S.Ct. at 1021 n. 15.

The *Alexander* court also expressed concern regarding the different procedures followed in labor arbitration, the comparative inexperience by labor arbitrators in civil rights litigation, the potential for conflicts between Title VII and the CBA, and the limited remedies that might be awarded by an arbitrator pursuant to the CBA. *Id.* at 56–58, 94 S.Ct. at 1023–25. Finally,

> A further concern is the union's exclusive control over the manner and extent to which an individual grievance is presented. In arbitration, as in the collective-bargaining process, the interests of the individual employee may be subordinated to the collective interests of all employees in the bargaining unit. Moreover, harmony of interest between the union and the individual employee cannot always be presumed, especially where a claim of racial discrimination is made. And a breach of the union's duty of fair representation may prove difficult to establish. In this respect, it is noteworthy that Congress thought it necessary to afford the protections of Title VII against unions as well as employers.

*Id.* at 58 n. 19, 94 S.Ct. at 1024 n. 19. The Court concluded that "the federal policy favoring arbitration of labor disputes and the federal policy against discriminatory employment practices can best be accommodated by permitting an employee to pursue fully both his remedy under the grievance-arbitration clause of a collective-bargaining agreement and his cause of action under Title VII. The federal court should consider the employee's claim *de novo*. The arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate." *Id.* at 60, 94 S.Ct. at 1025.

Eighteen years later, the Supreme Court granted certiorari to decide the validity of an arbitration clause in an individual contract, as opposed to a collective bargaining agreement. In *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), the plaintiff was a registered securities representative who, in the course of registering with the New York Stock Exchange ("NYSE"), signed an agreement to arbitrate any disputes arising out of his employment or termination of employment. Plaintiff was later terminated, allegedly on account of his age, and brought an action in federal court for violation of the

Age Discrimination in Employment Act ("ADEA").

The Supreme Court held that Gilmer was bound by the arbitration agreement he had signed. The court emphasized that Gilmer was not foregoing any of his substantive legal rights under ADEA, but merely submitting those claims for resolution in an arbitral, rather than a judicial, forum. *Id.* at 26, 111 S.Ct. at 1652. So long as Gilmer could effectively vindicate those rights in the arbitral forum, the purpose of the statute would not be frustrated. *Id.* at 28, 111 S.Ct. at 1653. The Court observed that under the NYSE arbitration rules the arbitrator had authority to award the same relief to Gilmer as could be obtained in a court of law. *Id.* at 32, 111 S.Ct. at 1655. The Court rejected Gilmer's concerns about the fairness of the arbitration proceedings, finding that the particular rules employed by the NYSE were adequate. *Id.* at 30–32, 111 S.Ct. at 1654–55. The Court also rejected Gilmer's contention that he had not voluntarily signed the arbitration agreement, noting that Gilmer was an experienced businessman. *Id.* at 33, 111 S.Ct. at 1655–56.

*Gilmer* might be viewed as a "sea change," rejecting the views expressed in *Alexander* and giving the court's blessing to coerced arbitration of all individual civil rights claims. However, the *Gilmer* Court gave mixed signals. On the one hand, it rejected the "mistrust of the arbitral process" expressed in *Alexander.* On the other hand, the Court disclaimed any intention to overrule the holdings in *Alexander v. Gardner–Denver* and its progeny, *Barrentine v. Arkansas–Best Freight System Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) and *McDonald v. West Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984):

> In holding that the employee [in *Alexander v. Gardner–Denver* ] was not foreclosed from bringing the Title VII claim, we stressed that an employee's contractual rights under a collective-bargaining agreement are distinct from the employee's statutory Title VII rights:
>
> > "In submitting his grievance to arbitration, an employee seeks to vindicate his contractual right under a collective-bargaining agreement. By contrast, in fil-

ing a lawsuit under Title VII, an employee asserts independent statutory rights accorded by Congress. The distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence."

We also noted that a labor arbitrator has authority only to resolve questions of contractual rights. The arbitrator's "task is to effectuate the intent of the parties" and he or she does not have the "general authority to invoke public laws that conflict with the bargain between the parties." By contrast, "in instituting an action under Title VII, the employee is not seeking review of the arbitrator's decision. Rather, he is asserting a statutory right independent of the arbitration process." We further expressed concern that in collective-bargaining arbitration "the interests of the individual employee may be subordinated to the collective interests of all employees in the bargaining unit."

*Barrentine* and *McDonald* similarly involved the issue whether arbitration under a collective-bargaining agreement precluded a subsequent statutory claim. In holding that the statutory claims were not precluded, we noted, as in *Gardner–Denver,* the difference between contractual rights under a collective-bargaining agreement and individual statutory rights, the potential disparity in interests between a union and an employee, and the limited authority and power of labor arbitrators.

There are several important distinctions between the *Gardner–Denver* line of cases and the case before us. First, those cases did not involve the issue of the enforceability of an agreement to arbitrate statutory claims. Rather, they involved the quite different issue whether arbitration of contract-based claims precluded subsequent judicial resolution of statutory claims. Since the employees there had not agreed to arbitrate their statutory claims, and the labor arbitrators were not authorized to resolve such claims, the arbitration in those cases understandably was held not to preclude subsequent statutory actions. Second, because the arbitration in those

cases occurred in the context of a collective-bargaining agreement, the claimants there were represented by their unions in the arbitration proceedings. An important concern therefore was the tension between collective representation and individual statutory rights, a concern not applicable to the present case. Finally, those cases were not decided under the FAA, which, as discussed above, reflects a "liberal federal policy favoring arbitration agreements."

*Id.* at 34–35, 111 S.Ct. at 1656–57 (internal citations omitted).

In the years since *Gilmer* was decided, the Ninth Circuit has enforced arbitration agreements that were part of an individual employment contract, while carefully distinguishing cases in which the arbitration clause was part of a collective bargaining agreement. *See Mago v. Shearson Lehman Hutton, Inc.*, 956 F.2d 932, 935 (9th Cir.1992); *Prudential Ins. Co. v. Lai*, 42 F.3d 1299 (9th Cir.1994).

Controlling case law from the Supreme Court and this Circuit thus holds that an employee's right to a judicial forum for his or her Title VII claims cannot be waived by a binding arbitration clause inserted in a collective bargaining agreement. Owens essentially is asking this court to declare those precedents void. The question is whether there is any basis for doing so.

Owens first cites a number of cases, from this and other circuits, which enforced arbitration agreements in an individual employment contract. *See, e.g., Mago*, 956 F.2d at 935; *Prudential Ins., Co.*, 42 F.3d 1299. However, in none of those cases was the arbitration clause contained in a collective bargaining agreement. Consequently, these cases merely follow the *Gilmer/Alexander* dichotomy established by the Supreme Court. They do not repudiate *Alexander.*

Next, Owens contends that the 1991 Civil Rights Act overruled *Alexander*, citing the following language in the Act:

Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including ... arbitration, is encouraged to resolve disputes arising under the Acts or provisions of Federal law amended by this title.

Pub.L. 102–166, § 18. The Ninth Circuit has expressly rejected Owens' contention that this language abrogates the holding in *Alexander. Prudential Ins. Co.*, 42 F.3d at 1304–05. The Circuit cited language from the House Report on the bill which expressly disclaimed any intent to overrule *Alexander:*

The committee emphasizes ... that the use of alternative dispute resolution mechanisms is intended to supplement, not supplant, the remedies provided by Title VII. Thus, for example, the committee believes that any agreement to submit disputed issues to arbitration, whether in the context of a collective bargaining agreement or in an employment contract, does not preclude the affected person from seeking relief under the enforcement provisions of Title VII. This view is consistent with the Supreme Court's interpretation of Title VII in *Alexander v. Gardner–Denver Co.*, 415 U.S. 36 [94 S.Ct. 1011, 39 L.Ed.2d 147] (1974). The committee does not intend for the inclusion of this section to be used to preclude rights and remedies that would otherwise be available.

HR Rep. No. 40(I), 102nd Cong., 1st Sess., reprinted in 1991 USCCAN 549, 635. Had Congress desired to abrogate the holding in *Alexander*, it could have done so expressly in a single sentence: "A collective bargaining agreement may provide for binding arbitration, in lieu of any judicial remedy, for disputes arising under the Acts or provisions of Federal law amended by this title." Instead, Congress chose to adopt weaker language that left *Alexander* intact. In the very same bill, Congress expressly overruled several other Supreme Court precedents. Congress clearly knew how to take such action when it desired.

Finally, Owens cites a recent opinion from the Fourth Circuit, *Austin v. Owens–Brockway Glass Container Inc.*, 78 F.3d 875 (4th Cir.), *cert. den.*, —— U.S. ——, 117 S.Ct. 432, 136 L.Ed.2d 330 (1996), which held that a binding arbitration clause in a collective bargaining agreement is sufficient to bar an employee from pursuing a Title VII or ADA claim in the courts. I find the *Austin* court's

analysis unpersuasive. *Austin* cites *Gilmer* and the 1991 Civil Rights Act amendment for the proposition that arbitration is encouraged. However, both those authorities expressly disclaim any intent to overrule *Alexander* with regard to arbitration clauses in collective bargaining agreements. *Austin* offers no other basis for concluding that *Alexander* has been abrogated. This glaring omission has been noted by other courts. *See Pryner v. Tractor Supply Co.*, 927 F.Supp. 1140, 1145–46 (S.D.Ind.1996) (the fatal flaw in *Austin* is its failure to fully consider the prior holding of *Alexander v. Gardner–Denver*); *Bush v. Carrier*, 940 F.Supp. 1040, 1045–46 (E.D.Tex.1996) (declining to follow *Austin*); *Bynes v. Ahrenkiel Ship Management, (U.S.), Inc.*, 944 F.Supp. 485 (W.D.La.1996) (same); *Buckley v. Gallo Sales Co.*, 949 F.Supp. 737, 743 (N.D.Cal. 1996) (declining to follow *Austin* and concluding that the Ninth Circuit would do the same); *Hill v. American National Can Co.*, 952 F.Supp. 398 (N.D.Tex.1996) (declining to follow *Austin*).[5]

The *Austin* court cited several post-*Gilmer* cases in which arbitration clauses were enforced, but each of those cases concerned a clause in an *individual* employment contract such as the one at issue in *Gilmer*. None of the cases relied upon by *Austin* concerned an arbitration clause inserted in a CBA. The vast majority of reported post-*Gilmer* decisions have concluded that *Alexander v. Gardner–Denver* still controls in the circumstances presented here. *See, e.g., Tran v. Tran*, 54 F.3d 115 (2d Cir.1995), *cert den.*, —— U.S. ——, 116 S.Ct. 1417, 134 L.Ed.2d 542 (1996); *E.E.O.C. v. Board of Governors*, 957 F.2d 424, 431 n. 11 (7th Cir.), *cert den.*, 506 U.S. 906, 113 S.Ct. 299, 121 L.Ed.2d 223 (1992); *Buckley*, 949 F.Supp. at 742–43; *Bynes*, 944 F.Supp. 485; *Bush*, 940 F.Supp. at 1045–46; *Pryner*, 927 F.Supp. at 1145–46; *Hill*, 952 F.Supp. 398; *Humphrey v. Council of Jewish Federations*, 901 F.Supp. 703, 709–10 (S.D.N.Y.1995); *DiPuccio v. United Parcel Service*, 890 F.Supp. 688, 692–93 (N.D.Ohio 1995); *Jackson v. Quanex Corp.*, 889 F.Supp. 1007, 1010–11

(E.D.Mich.1995); *Randolph v. Cooper Indus.*, 879 F.Supp. 518 (W.D.Pa.1994); *Block v. Art Iron, Inc.*, 866 F.Supp. 380, 385–87 (N.D.Ind.1994); *Griffith v. Keystone Steel Wire Co.*, 858 F.Supp. 802, 804 (C.D.Ill.1994); *Claps v. Moliterno Stone Sales Inc.*, 819 F.Supp. 141, 147 (D.Conn.1993). *But cf. Brummett v. Copaz Packing Corp.*, 954 F.Supp. 160 (S.D.Ohio 1996) (following *Austin*); *Jessie v. Carter Health Care Center, Inc.*, 930 F.Supp. 1174 (E.D.Ky.1996)(same); *Bright v. Norshipco*, 951 F.Supp. 95 (E.D.Va. 1997)(same, though the court is in the Fourth Circuit and thus is bound by the decision in *Austin*).

The judges in this District have adhered to *Alexander v. Gardner–Denver*. *See Schmidt v. Safeway, Inc.*, 864 F.Supp. 991, 995 (D.Or.1994)(opinion by Judge Panner); *James v. James River Paper Co.*, CV 94–142–ST (D Or 1994) (findings and recommendations issued by Magistrate Judge Stewart on June 29, 1994 and adopted by Judge Jones on July 26, 1994).

Admittedly, there is some incongruity between the holdings in *Alexander* and *Gilmer*. As a practical matter, an arbitration clause inserted in a personal employment contract may be no more "voluntary" than one inserted in a collective bargaining agreement. Arbitration clauses such as the one in *Gilmer* are, for the average employee, not the product of bargaining but a non-negotiable adhesion contract. Consent to the arbitration clause is the price for obtaining or retaining employment. Nonetheless, the *Gilmer* Court elected to distinguish *Alexander* rather than overrule it, and Congress left that holding intact.

There also is some logic to Owens' assertion that the Title VII claims concern other employees and their relationship with each other and with their employer, and thus the Title VII claims cannot be viewed in isolation. However, that is true of all cases in which individual rights are at issue. For instance, one person's right to a smoke-free workplace may come at the expense of anoth-

---

5. Owens also suggests that there are important differences between the language of the arbitration clause at issue here and the one in *Alexan-* *der,* that warrant departing from the holding in that case. I disagree.

er employee's right to smoke on the job. Owens also contends that resolution of plaintiff's claims may impact the collective bargaining agreement. There is the potential for some overlap; a claim that an employee was wrongly terminated or not promoted on account of race, gender, or other forbidden grounds may well implicate the terms of a collective bargaining agreement which establishes a grievance procedure to resolve claims for wrongful termination or refusal to promote. Claims relating to discrimination in job assignments, shifts, seniority, and working conditions may also implicate matters that are the subject of the collective bargaining agreement. On the other hand, *Alexander* does not preclude requiring an employee to first pursue her grievances before bringing an action; it merely holds that the grievance procedure is not the exclusive remedy and an adverse decision in that forum does not preclude filing a Title VII action.

█ Defining the balance between individual rights and the policies reflected in federal labor law is ultimately a political decision that Congress must make. In *Alexander*, the Supreme Court offered its interpretation of the balance that Congress has struck. In the years since, Congress has acquiesced in that decision. Consequently, it remains the law of the land. Congress or the Supreme Court may overrule *Alexander*, but this court is bound by controlling precedent in the absence of intervening changes in the law. *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989) (where a Supreme Court precedent has direct application in a case, yet may rest on reasons rejected in some other line of decision, the lower courts must follow the case which directly controls, leaving to the Supreme Court "the perogative of overruling its own decisions"); *Ackerley Communications of the Northwest, Inc. v. Krochalis*, 108 F.3d 1095, 1099 (9th Cir.1997).

## II

Even in the absence of controlling precedent, I would likely reach the same result in this particular case. Laws prohibiting discrimination on account of factors such as race, gender, national origin, religion, and disability are designed to protect the rights of minorities or other groups whom Congress has determined require special protection. The same is true of laws forbidding sexual harassment. There is an inherent tension between these laws and a rule that would permit the majority to waive or compromise the very laws that were intended to protect the rights of the minority. The fear is that during the collective bargaining process, a union that is—to cite one possible example— overwhelmingly white, male, and able-bodied, may be all too willing to compromise the special protections that are afforded to women, minorities, or persons with disabilities. The majority of union members may not perceive any personal benefit from laws that protect only a minority, or may in some cases be openly hostile to the changes mandated by those laws.[6] The employer also has a powerful incentive to incorporate in a collective bargaining agreement terms that limit its potential liability under the civil rights laws.

A further concern is that the union and its membership may themselves be the target of a Title VII action. *Cf Woods v. Graphic Communications*, 925 F.2d 1195, 1200–03 (9th Cir.1991) (union may be liable under Title VII for refusing to process grievances of black members alleging racial discrimination, and acquiescing in racially discriminatory work environment); *Local Union No. 12, United Rubber Workers v. N.L.R.B.*, 368 F.2d 12 (5th Cir.1966) (union allegedly refused to process any grievances by black members concerning segregated plant facilities). In the instant case, most of the offensive conduct allegedly was perpetrated by employees of Owens who are members and officers of Local 112, including its President and Vice–President. The defendants include

---

6. I do not mean to imply that this is necessarily true of the defendant Union. On the contrary, the supplemental briefing suggests that there may be a substantial number of female members in Local 112, including shop stewards and mem-

bers of the union's Business Committee. Nonetheless, the potential that individual civil rights will be subordinated is a significant concern that cannot be gainsaid.

Local 112 and the parent International Union. In essence, the defendants have contracted amongst themselves to waive plaintiff's rights and to submit plaintiff's claims against them to binding arbitration. Defendants now ask this court to enforce that agreement against plaintiff.

■ A related matter is the efficacy of the grievance and arbitration procedure. At my request, the parties submitted supplemental briefing on these issues.[7] Because this motion to dismiss is directed at the court's jurisdiction to hear this case, as opposed to the merits of the complaint, the court may properly consider certain materials outside the complaint such as the collective bargaining agreements.[8] *Winter*, 900 F.2d at 1324; *Roberts*, 812 F.2d at 1177. The court may also resolve factual disputes regarding jurisdictional matters to the extent they are separable from the merits of the controversy. *Id.*

Owens and the Union defendants agree that the CBA provides for a four-step grievance procedure. The employee initiates a grievance by presenting it to his or her foreman and shop steward "within three (3) working days from the date the grievance arises." If the grievance is not resolved in Step 1, the employee and Shop Steward may refer the matter to the Local 112 Business Committee for investigation. If the Business Committee elects to pursue the grievance, it must present the grievance to the employee's department head within seven days. If the Business Committee is dissatisfied with the response, the Committee and the International Representatives of the Union have seven more days in which to jointly present the grievance to the Owens' plant manager.[9] If the grievance still has not been resolved to the Union's satisfaction, the fourth step is a conference between the International President of the Union and the Vice President of Human Resources for Owens. Finally, either the Union or Owens may request binding arbitration of the dispute. The arbitrators are selected by Owens and the Union, and follow the Voluntary Labor Arbitration Rules of the American Arbitration Association. The arbitrator has no power to add to, subtract from, or modify the terms of the CBA.

While this procedure may work well for ordinary labor disputes, there are a number of unique problems in applying these procedures to the Title VII and state law claims at issue here. First, with the exception of the initial decision to present a grievance, it is the Union and Owens that are adjusting the grievance, the Union and Owens that decide whether a grievance has been satisfactorily resolved, the Union and Owens that decide whether to elevate a grievance to the next step or allow it to die, the Union and Owens that decide whether to refer the grievance to arbitration, the Union and Owens that select the arbiters, and the Union and Owens that participate in and control the arbitration process. CBA, Articles 26 and 27. *See also Griffin v. International Union, United Auto., Aerospace and Agr. Implement Workers of America*, 469 F.2d 181, 183 (4th Cir. 1972) (an individual employee has no absolute right to insist that his grievance be pressed through any particular stage of the contractual grievance procedure; union may choose to process only those grievances that it concludes will justify the expense and time involved in terms of benefitting the membership at large.)

It is also the Union membership and officers who, along with Owens, are accused of violating plaintiff's Title VII rights. That presents a serious conflict of interest. If the

---

7. Thoughtful responses were received from the Owens and Union defendants. Plaintiff's counsel declined the opportunity to brief these issues.

8. Defendants' request for judicial notice of the collective bargaining agreement is, therefore, moot. However, I question whether the terms of a collective bargaining agreement between two private parties satisfies FRE 201(b)(2) (court may take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.") Rather, this language appears to contemplate judicial notice of facts such as the mileage between Portland and Seattle, or the height of Mount Hood.

9. During most of the time period addressed by the complaint, the plant manager was Mark Recker. Notably, Recker is named in the complaint as one of the leading protagonists. That raises some questions about the efficacy of steps one through three of the grievance procedure.

threat of legal action was looming on the horizon, the Union and Owens might still have a powerful incentive to resolve the problem in order to preclude a lawsuit. Once that threat is eliminated, the situation is reversed. The Union and Owens would both have incentive to let the claims quietly die.

Owens argues that if the employee is dissatisfied with the Union's representation, he or she may bring a separate action against the Union for breach of the duty of fair representation. The Supreme Court found that argument unpersuasive because such a claim may be difficult to prove. *Alexander v. Gardner–Denver*, 415 U.S. at 58 n. 19, 94 S.Ct. at 1024 n. 19. It is analogous to ignoring a clear conflict of interest on the part of an attorney because his client can always bring an action for malpractice. In some cases the client could choose to knowingly waive the conflict, but here the plaintiff is given no option: she must accept the Union as her representative without regard to any conflict of interest.

Owens and the Union also contend that 29 U.S.C. § 159(a) allows plaintiff to pursue a grievance independently of the Union. That section states, in relevant part, that:

> [A]ny individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect [and further providing that] the bargaining representative has been given opportunity to be present at such adjustment.

While § 159(a) gives plaintiff a right to "present" her grievances to her employer, it apparently does not compel Owens to meet with plaintiff, let alone to take any action on her grievances. *See Broniman v. Great Atlantic & Pacific Tea Co.*, 353 F.2d 559, 562 (6th Cir.1965) (§ 159(a) preserves the employee's right to approach the employer individually, but does not require the employer to accept the invitation or to adjust the grievance); *Black–Clawson Co. v. International Ass'n of Machinists, Lodge 355, Dist. 137*, 313 F.2d 179 (2d Cir.1962) (same); *Malone v. United States Postal Service*, 526 F.2d 1099, 1106–07 (6th Cir.1975); *Local Union No. 12, United Rubber Workers of America v. N.L.R.B.*, 368 F.2d 12, 18 n. 8 (5th Cir.1966) ("substantial doubt exists concerning the extent of the employee's 'right' to compel his employer to comply with the grievance and arbitration provisions in the bargaining contract when his union refuses to represent him"); *Serra v. Pepsi–Cola General Bottlers Inc.*, 248 F.Supp. 684, 686 (N.D.Ill.1965); *Ostrofsky v. United Steelworkers of America*, 171 F.Supp. 782, 791–92 (D.Md.1959). *But cf Hughes Tool Co. v. N.L.R.B.*, 147 F.2d 69, 73 (5th Cir.1945) (the right to "present" a grievance includes the right to fully prosecute a grievance through all stages and appeals); *Donnelly v. United Fruit Co.*, 40 N.J. 61, 190 A.2d 825, 835 (N.J.1963) (if union is not properly representing employee, he may intervene in arbitration proceedings and obtain independent representation, and is not bound by the actions of the union in disposing of his grievance.)

In their responses to this court's questions, Owens and the Union agreed that plaintiff could not pursue arbitration on her own. Only the Union and Owens may request arbitration of a grievance. Owens again suggests that if the Union wrongly refused to pursue the grievance or failed to properly represent her, plaintiff could bring an action against the Union for breach of its duty of fair representation. However, that is rarely a satisfactory answer. *Alexander*, 415 U.S. at 58 n. 19, 94 S.Ct. at 1024 n. 19. It requires the plaintiff to litigate and win a "case within a case"; the plaintiff must show that the union acted arbitrarily or in bad faith in its handling of the grievance and must also prove that, but for the Union's misconduct, she likely would have prevailed on her grievance. *See Chauffeurs, Teamsters & Helpers, Local No., 391 v. Terry*, 494 U.S. 558, 564, 110 S.Ct. 1339, 1344, 108 L.Ed.2d 519 (1990); *Vaca v. Sipes*, 386 U.S. 171, 192–93, 196–98, 87 S.Ct. 903, 917–18, 919–21, 17 L.Ed.2d 842 (1967) (plaintiff must do more than show he would have prevailed on his grievance; he must also prove arbi-

trariness or bad faith on the part of the union in processing his grievance and prove that his damages were caused by the union's conduct); *Dushaw v. Roadway Express, Inc.,* 66 F.3d 129, 132 (6th Cir.1995) (plaintiff cannot recover from either union or employer unless he proves both breach of the CBA by the employer and breach of the duty of fair representation by the union which substantially affected the outcome of the grievance proceeding); *Deboles v. Trans World Airlines, Inc.,* 552 F.2d 1005, 1019–20 (3d Cir. 1977) (union not liable for breach of duty of fair representation absent proof of that the breach directly damaged person to whom the duty was owed.)

There is, of course, precedent for such dual claims in "hybrid § 301" actions where the employee brings an action against the employer for breach of the collective bargaining agreement along with an action against the union for breach of its duty of fair representation. *See, e.g., Clayton v. International Union, United Automobile, Aerospace & Agricultural Implement Workers of America,* 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981); *Vaca,* 386 U.S. at 186, 87 S.Ct. at 914–15; *Dushaw,* 66 F.3d 129. In such cases, however, the rights in question arise under the collective bargaining agreement, which also establishes the exclusive remedy for violations of that agreement. Ordinarily there would be no recourse to the courts. Consequently, it is incumbent upon the employee to establish the existence of extraordinary circumstances that justify invocation of a judicial remedy.

■ To the extent an employee's rights arise under a collective bargaining agreement and are created by that agreement, it may be appropriate for those rights to be vindicated solely through the grievance procedures established by that agreement. *Cf Republic Steel Corp. v. Maddox,* 379 U.S. 650, 652–53, 85 S.Ct. 614, 616–17, 13 L.Ed.2d 580 (1965) (individual employee wishing to assert contract grievances must first attempt to use the contract grievance procedure agreed upon by employer and union as the mode of redress); *Smith v. Evening News Ass'n,* 371 U.S. 195, 200, 83 S.Ct. 267, 270, 9 L.Ed.2d 246 (1962)(rights of individual em-

ployees arising from a CBA are often inextricably intertwined with union interests and therefore may not be pursued by a private state law action, but are subject to the provisions of federal labor law).

However, the rights at issue here were not created by the collective bargaining agreement, but by Congress. They do not arise from the contract. There was no consideration for the employer's promise to follow the civil rights laws, for that duty already existed. These rights are not subject to negotiation. They cannot be bargained away by the Union in return for an extra twenty-five cents an hour in wages or two additional days of sick leave. Nor is a union authorized to compromise an employee's civil rights for the good of the bargaining unit as a whole.

It has also been suggested that by agreeing to arbitration the employee does not forfeit any substantive rights, but simply trades one forum for another. *Gilmer,* 500 U.S. at 26, 111 S.Ct. at 1652. While that may have been true of the specific arbitration agreement at issue in *Gilmer,* that does not appear to be the case here. In a judicial forum, plaintiff would have an absolute right to pursue her Title VII claims. She would not need the Union's blessings to pursue her claims, nor could her claims be involuntarily dismissed by the Union. Her cause would be decided by a jury or a federal judge, not a panel selected exclusively by the defendants. Plaintiff would be at liberty to retain counsel of her own choosing and to present her own case, whereas—according to Owens' reply brief—plaintiff would be represented during the grievance and arbitration procedure by the Union or by an attorney representing the Union. It is indeed an unusual set of facts were the plaintiff is represented in litigation by the co-defendant's attorney.

In addition, the CBA requires that all grievances be presented within three days from the date the grievance arises. By contrast, the statute of limitations in a Title VII action is 300 days, 42 U.S.C. § 2000e-5(e)(1), and evidence of earlier incidents may be admissible to prove a continuing violation. *Varner v. National Super Markets, Inc.,* 94 F.3d 1209, 1214 (8th Cir.1996). Admittedly, there is some merit to a rule that requires

claims to be promptly asserted so the problem does not fester. The purposes of Title VII would not necessarily be undermined by a policy of nipping the misconduct in the bud, rather than allowing the injury to compound, and awarding damages later. However, that policy has already been implemented in large part by the comparatively brief statute of limitations for Title VII claims when compared to the limitations periods for ordinary tort or contract claims. The CBA effectively overrides the 300–day statute of limitations established by Congress and replaces it with a three-day statute of limitations. That is a material alteration. A three-day statute of limitation may be suitable for the types of claims that commonly arise under a CBA; it is not necessarily suited to a Title VII claim predicated upon maintenance of a hostile work environment, or for many sexual harassment claims. In such cases, it may not be a particular isolated act that gives rise to the claim, but a pattern of conduct.

A further consideration is the remedies that would be available to plaintiff under the CBA. Under Title VII, an employee may recover compensatory and punitive damages as well as attorney fees. However, the CBA provides that the "arbitrator shall have no power to add to, subtract from, or modify the terms of this Contract ..." The question, then, is what remedies are authorized by the contract.

In response to the court's questions, the Union has suggested that an arbitrator has authority to award some compensatory damages under the label of "make whole." However, the examples cited by the Union appear to be limited to economic damages and would not authorize an award of non-economic damages. There are some Ninth Circuit cases that seem to allow a labor arbitrator to award punitive damages, at least in the absence of any contractual provision limiting that authority. *Goss Golden West Sheet Metal, Inc. v. Sheet Metal Workers Inter. Union, Local 104*, 933 F.2d 759 (9th Cir. 1991); *Pullman Power Prods. Corp. v. Local 403*, 856 F.2d 1211 (9th Cir.1988) (over a strong dissent from Judge Beezer, who maintained that settled Ninth Circuit law forbids an award of punitive damages by a labor arbitrator absent express authorization of such awards in the CBA.) [10]

However, a careful reading of those cases discloses that the Circuit merely applied an extremely deferential standard of review and deferred to the arbitral panel's interpretation of its own powers. *Goss Golden West*, 933 F.2d at 764 ("we cannot say that ... the agreement would not even arguably include the power to make an award of punitive damages.") That is a far cry from affirmatively holding that the arbitrators who would hear plaintiff's claim are authorized to award punitive damages. Moreover, as the Union acknowledges, there is a split among the circuits on this issue, with some circuits holding that labor arbitrators have no authority to award punitive damages.[11] At best it remains an unsettled issue, absent any contract language expressly conferring such authority.

**10.** The Supreme Court's recent decision in *Mastrobuono v. Shearson Lehman Hutton Inc.*, 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995), is not dispositive of this question. It was not a labor arbitration case, and the arbitration rules designated in the contract expressly authorized an award of punitive damages.

**11.** There is a longstanding reluctance to award punitive damages in labor cases. *See, e.g., Local 127, United Shoe Workers of America v. Brooks Shoe Mfg. Co.*, 298 F.2d 277, 284 (3d Cir.1962) (Biggs, concurring) ("It is the general policy of the federal labor laws ... to supply remedies rather than punishment.") In part, that may be because punitive damages are ordinarily not available in an action for breach of a contract. However, the aversion to punitive damages in labor cases appears to extend far beyond that. *See International Bro. of Electrical Workers v.*

*Foust*, 442 U.S. 42, 52, 99 S.Ct. 2121, 2127–28, 60 L.Ed.2d 698 (1979) (denying punitive damages); *Association of Flight Attendants v. Horizon Air Indus., Inc.*, 976 F.2d 541, 551 (9th Cir.1992) (citing this policy as rationale for denying award of attorney fees to prevailing party); *Moore v. Local Union 569, IBEW*, 989 F.2d 1534, 1542 (9th Cir.1993); *United Transportation Union Local 74 v. Consolidated Rail Corp.*, 881 F.2d 282 (6th Cir.1989); *Williams v. Pacific Maritime Ass'n*, 421 F.2d 1287, 1289 (9th Cir.1970); *Atwood v. Pacific Maritime Ass'n*, 432 F.Supp. 491, 498 (D.Or.1977) (all concluding that there was no right to punitive damages). *But cf Woods v. Graphic Communications*, 925 F.2d 1195, 1204–05 (9th Cir.1991) (awarding punitive damages against union for racial discrimination against member).

Owens suggests that the provisions and remedies of Title VII are incorporated by reference in the contract, hence, the arbitrator would have the power to award any remedy that could be awarded by a court, including compensatory and punitive damages. That is certainly one plausible interpretation of the contract. However, that interpretation is not binding upon the arbitral panel and this court would have only limited authority to review the arbitrator's contrary holding. *United Paperworkers International Union v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 371, 98 L.Ed.2d 286 (1987) ("as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.") The same holds true for the suggestion that the arbitrator might still consider plaintiff's claims notwithstanding her failure to present a grievance within three days of the incident in question. That is one potential interpretation of the contract, but unless it is the only permissible reading that interpretation would not be binding upon the arbitral panel.

█ In the end, I cannot say with any degree of certainty that the contractual remedies are substantially equivalent to the remedies that would otherwise be available to plaintiff in a court of law, or that plaintiff could "effectively vindicate" her Title VII rights under the procedures established by the CBA. *Cf Gilmer*, 500 U.S. at 26, 28, 111 S.Ct. at 1652, 1653. That is a further reason for holding that plaintiff's claims are not barred by the arbitration clause in the CBA.[12]

### III

In the alternative, Owens asks the court to stay this action while plaintiff exhausts her remedies under the grievance procedure, including (presumably non-binding) arbitration. This question was not definitively addressed in *Alexander*, since the employee had in-

voked the grievance and arbitration procedures and filed suit only after failing to obtain the desired relief.

█ I have serious concerns about the efficacy of the grievance and arbitration procedures in this case, particularly when the Union and Owens are both defendants. However, there are also important considerations that favor requiring an employee to first attempt to resolve the matter by way of the established grievance procedure before resorting to the courts. *See, e.g., Republic Steel*, 379 U.S. at 653, 85 S.Ct. at 616–17. In *Alexander v. Gardner–Denver*, the Court observed that:

> "[T]he federal policy favoring arbitration of labor disputes and the federal policy against discriminatory employment practices can best be accommodated by permitting an employee to pursue fully both his remedy under the grievance-arbitration clause of a collective-bargaining agreement and his cause of action under Title VII. The federal court should consider the employee's claim de novo. The arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate."

415 U.S. at 60, 94 S.Ct. at 1025. The Court thus sought to address some of the concerns that Owens has raised regarding the overlap between Title VII claims and issues that may be the subject of the collective bargaining agreement. Therefore, I will stay this action and require plaintiff to first pursue the grievance and arbitration remedies available to her under the CBA. In the event that plaintiff's worst fears regarding that procedure materialize, she still has resort to the courts.

Exhaustion may prove futile and the parties may be back before this court several months from now. Nonetheless, I conclude that it is a necessary step in order to minimize any friction between the vindication of individual statutory rights and the federal labor policies that favor the collective bargaining process. Indeed, had plaintiff

---

**12.** Plaintiff has argued that membership in the union was mandatory, she did not vote in favor of the collective bargaining agreement, and she did not knowingly and voluntarily waive her Title VII rights. Whether plaintiff personally voted for the agreement or read it is of no consequence. Rather, such questions are subsumed within the larger question of whether a union may consent to arbitration of claims by its members for violation of their civil rights.

promptly lodged grievances, instead of allowing the matter to fester, it might have been possible to avoid some of the problems that later developed. There also is some merit to having grievances addressed, at least at the initial stages, by those who are most familiar with the participants and the issues involved. For instance, while it is possible that Recker and Benson were discriminating against plaintiff because of her gender, I cannot preclude the possibility that plaintiff's gender had nothing to do with their actions and they genuinely believed that she would benefit from additional training before taking the examination.

Given the advanced status of the grievances here, the parties may mutually agree to forego the initial grievance stages and proceed directly to arbitration. Since plaintiff will not be required to accept the decision of the arbitrator as final, the same rule will apply to defendants. Non-binding arbitration may appear to be a waste of time, but it may also provide a preview of the likely result of any litigation and enhance the prospects for settlement.[13]

### Motion to Strike Claims for Damages in Excess of Cap

Owens also moves to strike plaintiff's prayer for damages in excess of the cap established by the Civil Rights Act of 1991. 42 U.S.C. § 1981a(b)(3) provides that:

> The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party ... $300,000.

The complaint demands that Owens pay compensatory damages of $300,000 and *also* punitive damages of $300,000. Owens correctly asserts that the $300,000 limit is for compensatory and punitive damages *combined* hence plaintiff cannot recover more than that sum. *See Kimzey v. Wal–Mart Stores, Inc.,* 107 F.3d 568 (8th Cir.1997) ("Title VII provides that the upper limit on an award including punitive and compensatory damages in a case such as this is $300,000.")

However, that does not preclude plaintiff from making such a demand in her complaint. The jury could conceivably award $300,000 in compensatory damages and no punitive damages, or $20,000 in compensatory damages and $280,000 in punitive damages. Plaintiff is, therefore, entitled to plead $300,000 in compensatory damages and also $300,000 in punitive damages.[14]

Owens also protests that plaintiff seeks $300,000 in damages for the underlying Title VII claim, and an additional $300,000 in damages on her claim that Owens illegally retaliated against her for asserting the Title VII claim. Owens contends that the $300,000 limit was intended to limit the total recovery on all of plaintiff's Title VII claims against her employer and she may not circumvent that limit by pleading multiple claims alleging separate violations of Title VII by the same defendant.

I agree with Owens' analysis of the statute. Plaintiff may not recover twice from Owens for the alleged violations of Title VII. I do not believe that a one-recovery rule "irrationally diminishes the consequences [to the employer] of retaliating against an employee who has complained of or resisted discrimination," as plaintiff suggests. A $300,000 cap upon damages is certainly adequate to seize the employer's attention. The employer will not have a license to retaliate without fear of consequences, for it is by no means certain

---

**13.** Nothing I have said in this opinion precludes the parties from agreeing to other methods for resolving this case, including arbitration on terms acceptable to all parties that address the concerns plaintiff has expressed regarding the existing arbitration procedure.

**14.** Several courts have held that granting a pretrial motion to strike a prayer for damages in excess of the statutory cap would violate the express language of 42 U.S.C. § 1981a(c)(2):

> "If a complaining party seeks compensatory or punitive damages under this section—the court shall not inform the jury of the [damage cap] limitations ..."

*Johnson v. Metropolitan Sewer Dist.,* 926 F.Supp. 874, 876 (E.D.Mo.1996); *Haltek v. Village of Park Forest,* 864 F.Supp. 802, 807 (N.D.Ill.1994).

that the award in the underlying case would exhaust the entire $300,000 cap. Indeed, there are cases where the employer has prevailed on the underlying sexual harassment claim only to then be found liable for retaliating against the employee for having filed the claim. *See, e.g., Iannone v. Frederic R. Harris Inc.*, 941 F.Supp. 403 (S.D.N.Y.1996).[15]

However, that possibility also counsels against granting Owens' motion to strike plaintiff's prayer for $300,000 in damages on her retaliation claim. Rather, the appropriate time to address the damage cap is during post-trial motions, assuming that this case progresses to that stage.

### Motion to Dismiss Owens–Illinois

 Defendant Owens–Illinois seeks dismissal of the claims against it. Plaintiff has not alleged any conduct by Owens–Illinois, which is the parent corporation of defendant Owens–Brockway. Ordinarily a parent corporation is not liable for the Title VII violations of its wholly owned subsidiary. *Watson v. Gulf & Western Industries*, 650 F.2d 990, 993 (9th Cir.1981). Plaintiff correctly observes that there are limited exceptions to that rule. However, plaintiff has offered no basis for this court to find that any of the exceptions is applicable here. Nor does there appear to be any pressing need for plaintiff to find such an exception in this case. Owens has stipulated that its Owens–Brockway subsidiary has more than 500 employees for purposes of evaluating its Title VII liability.[16] Owens has also represented to the court that the Owens–Brockway subsidiary has over one billion dollars in assets, in excess of one hundred million dollars in net equity, and is more than capable of paying any judgment that might be rendered in this case. In reliance upon those representations, I grant the motion to dismiss defendant Owens–Illinois.

At oral argument, plaintiff suggested that she was concerned with discovery and, in particular, the right to obtain documents that were in the possession of the parent corporation. The federal discovery rules would seem to provide ample means for plaintiff to obtain documents in the possession of defendant Owens–Illinois that relate to this case. That is not a valid basis to retain Owens–Illinois as party to this case. If a problem arises during discovery, the court will address it at that time.

### CONCLUSION

Owens' motion (# 17–1) to dismiss this action on grounds that arbitration is the sole remedy available to plaintiff is DENIED. Owens' alternative motion (# 17–2) to stay this action pending exhaustion of remedies is GRANTED. The results of the arbitration will not bar subsequent judicial action unless the parties otherwise agree. Owens' motion (# 17–3) to strike the prayer for damages in excess of the statutory cap is DENIED with leave to renew such motion post-trial. Owens' motion (# 17–4) to dismiss the Sixth Claim for negligence is GRANTED. Owens' motion (# 17–5) to dismiss defendant Owens–Illinois is GRANTED. Owens' Request for Judicial Notice (# 19–1) is DENIED as moot.

---

**15.** At oral argument, plaintiff suggested that a plaintiff might file a Title VII claim, which is resolved, after which the employer would have nothing to lose by subsequently retaliating against the plaintiff. Without deciding the issue, since it is not presented here, the scenario described by plaintiff would seemingly give rise to a separate claim. Resolution of the first claim would not waive any claims the plaintiff might have for subsequent Title VII violations.

**16.** Owens' reply brief used the number "over 300 employees". Reply Brief at 15. The court assumes this was a typographical error—the statute establishes a cap of $300,000 in damages from an employer with more than 500 employees—and that Owens–Brockway intended to stipulate that it has over 500 employees for purposes of 42 U.S.C. § 1981a. Owens should immediately advise the court if it has a different understanding of the stipulation.